No. 29,994.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, etc., *Plaintiff*, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SHAWNEE; J. A. EDDY, as County Treasurer, and CLARENCE SMITH, WALTER PLEASANT and RODNEY ELWARD, as the State Tax Commission, *Defendants*.

(294 Pac. 915.)

Opinion filed January 10, 1931.

*William A. Smith*, attorney-general, *Thomas F. Doran, Clayton E. Kline, Harry W. Colmery, M. F. Cosgrove*, all of Topeka, and *J. E. Haltigan*, of Wichita, for the plaintiff.

*C. B. Randall*, attorney for state tax commission, for the defendants.

*Frank Doster*, of Topeka, as *amicus curiæ*.

The opinion of the court was delivered by

HUTCHISON, J.: This is an original action in quo warranto brought by the state of Kansas on relation of the attorney-general against the board of county commissioners of Shawnee county, county treasurer and the tax commissioners of the state of Kansas, in which the state complains of the official attitude and conduct of the defendants in their refusal to exempt from taxation property belonging to minor children of a deceased soldier of the world war in the hands of their guardian, which was received from the United States government through the veterans' bureau, as monthly compensation and war-risk insurance for the use and benefit of the minors. The state urges the general importance and the interest of the public in this question and asks for a declaratory judgment in this case based upon the refusal of the defendants to exempt the property of one John Doster, guardian of children of a deceased world war veteran, who has their property invested in certain bonds of the Chile Copper Company, a private corporation, which were purchased exclusively with such compensation and insurance money received from the government, he being a guardian of the children duly appointed by the probate court of Shawnee county, Kansas.

The defendants maintain that such property in the guardian's hands is not exempt from taxation and have entered into a stipulation with the plaintiff in which it is agreed that Wade Doster died in the military service of the United States army on March 8, 1920; that he left surviving him two minor children, Caroline and Lenore, who are yet minors; that at the time of his death he carried $10,000 war-risk insurance for the benefit of the children, payable in monthly sums of $57.50, and also under the act of congress his children became entitled to war compensation in the monthly sum of $30 during their minority. It is further stipulated and agreed that of this compensation received by the guardian the sum of $1,271 was invested in fifty shares of the Chile Copper Company, a private corporation, which when later sold realized a sufficient amount to purchase $5,000 of bonds issued by the same company for the purchase price of $4,845; that on April 26, 1930, the guardian listed with the assessor the $5,000 of bonds and claimed for them the exemption from taxation in writing on the assessment form; that it was denied

by the defendants and the tax assessed against the property is in the sum of $170.50 for the year 1930. It is further stipulated:

"The above is submitted as a full and true statement of the facts pertaining to the question of the taxability under the acts of congress, of monied securities of a private corporation, purchased by the guardian of the minor children of a deceased world war soldier, with monies received by him as war compensation and war-risk insurance, and paid to him for said minors and remaining in his hands as guardian before final accounting and settlement and payment to the minors."

No question is raised by the defendants as to the nature or character of the proceeding, and the real question involved might be briefly stated as, whether corporate securities purchased by a guardian from compensation and insurance moneys payable from the United States veterans' bureau are taxable, which might very logically and properly cover the further question as to whether tangibles and intangibles purchased by a world war veteran from compensation and insurance payable from the United States veterans' bureau are taxable.

The section of the act of congress under which the exemption is claimed is 43 U. S. Stat. 613, U. S. Code Ann., Title 38, § 454, which is as follows:

"That the compensation, insurance, and maintenance and support allowance payable under titles II, III and IV, respectively, shall not be assignable; shall not be subject to the claims of creditors of any person to whom an award is made under titles II, III or IV; and shall be exempt from all taxation: *Provided,* That such compensation, insurance, and maintenance and support allowance shall be subject to any claims which the United States may have, under titles II, III, IV and V, against the person on whose account the compensation, insurance, or maintenance and support allowance is payable."

A careful examination of the able and exhaustive briefs on both sides and one from an *amicus curiæ* compels us to admit that this exact question has never been decided by any of our federal or state courts. This section was enacted on June 7, 1924, and the part above quoted is exactly the same as that enacted June 25, 1918, as section 2, chapter 104, 40 U. S. Stat. (U. S. Comp. Stat. 1918, § 514 nnn ¼, p. 1739).

Resort is had in the briefs to decisions on a somewhat similar act of congress granting pensions to civil war veterans, being section 4747, Revised Statutes of United States, passed March 3, 1873. And on this earlier pension statute only one tax exemption case is cited,

viz., *Manning v. Spry,* 121 Ia. 191, decided in 1903, where it was held:

"Pension money in the hands of a guardian of an insane pensioner is exempt from taxation, even though in the form of interest-bearing loans. The guardian is regarded as the agent of the government, and so long as the fund remains in his hands it is in transmission to the pensioner and under federal control." (Syl.)

Iowa has a statute exempting pensioners of the United States from the payment of taxes, and the court construed United States statute 4747 and the state statute 1309 together and reached the conclusion above quoted. In the opinion it was said:

"Construing these sections together, it is manifest that pension money is exempt, not only from execution, but also from taxation, so long as it remains in the shape of money to meet the daily wants and necessities of the pensioner. This must be so, else it would not inure wholly to the benefit of the pensioner. Moreover, when we consider the nature and object of this bounty, it is clear to our minds that, were there no statute expressly exempting such funds, they should not be held subject to taxation. . . .

"If the pensioner in this case had been *sui juris,* and had held in his possession pension money received from the government, we do not think such fund would have been subject to assessment for taxation. Indeed, section 1309 expressly exempts it. Had he, instead of holding the money, loaned it out, and taken bonds or mortgages as security, it may be the state would have had power to tax these securities. But we do not decide that question." (pp. 194, 196.)

Most of the decisions cited are on a different branch of the law, viz., exemption from execution, attachment and garnishment, and nearly all such decisions are constructions of old section 4747. It will therefore be necessary for us to make a comparison between the old and the new statutes in order to avail ourselves of the benefits of these conclusions reached and reasons given, and properly apply them to the new law now under consideration. The following is section 4747:

"No sum of money due, or to become due, to any pensioner, shall be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, whether the same remains with the pension office, or any officer or agent thereof, or is in course of transmission to the pensioner entitled thereto, but shall inure wholly to the benefit of such pensioner."

It will be conceded that statutes relating to pensions should be liberally construed, with a view of promoting their objects, but this liberality of construction must necessarily relate to remuneration of such beneficiaries as are entitled thereto from the government, and

cannot be said to set at naught general rules of construction as they affect such an important matter as taxation. The general rule relating to exemption from taxation cannot be nullified by a liberal construction to promote the object of the federal law granting pensions to beneficiaries. An exemption from taxation must never be presumed or assumed. It is the right of the state in the interest of the whole community unless it is plainly waived or relinquished, and all such tax exemption statutes must be strictly construed.

"It would seem that the relinquishment of such a power is never to be assumed. We will not say that a state may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear." (*Providence Bank v. Billings and Pittman,* 29 U. S. 514, 561, [4 Peters 514], opinion by Chief Justice Marshall.)

"These cases show the principle upon which is founded the rule that a claim for exemption from taxation must be clearly made out. Taxes being the sole means by which sovereignties can maintain their existence, any claim on the part of anyone to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language. There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded. It has been said that a well-founded doubt is fatal to the claim." (*Bank of Commerce v. Tennessee,* 161 U. S. 134, 146.)

Our own state has consistently and from its early history followed this principle of strict construction of tax-exemption statutes.

"Language creating an exemption from taxation should be strictly construed, and should not be extended further than the fair import of the words requires." (*Comm'rs of Miami Co. v. Brackenridge,* 12 Kan. 114, syl. ¶ 3.)

"Any person claiming immunity from the common burdens of taxation, which should rest equally upon all, must bring himself clearly within the exemption; and hence it is held that a provision creating an exemption should be strictly construed." (*Ottawa University v. Comm'rs of Franklin Co.,* 48 Kan. 460, 464, 29 Pac. 599.)

The same ruling was adhered to in *Stahl v. Educational Assoc'n,* 54 Kan. 542, 38 Pac. 796.

"A liberal policy is usually pursued in interpreting exemptions from ordinary debts, but grants of privilege with respect to taxation are strictly construed." (*Pefly v. Reynolds, Sheriff,* 115 Kan. 105, 107, 222 Pac. 121.)

Our own court in 1882 placed a construction upon this civil war pension act, section 4747, the opinion being written by Justice Brewer, a portion of which is as follows:

"The first question is as to the scope of this section of the United States statutes. Does it create an exemption of moneys in the hands of a pensioner, or simply protect such money in course of transmission to him? The difference is obvious and vast. If the exemption attaches to the money absolutely, then practically the state exemption law is amended by a federal statute. Counsel for plaintiffs in error earnestly contend that the federal government has no power thus to amend a state exemption law; that it cannot provide that money in the hands of one citizen of Kansas shall not be subject to seizure for the payment of his debts, when a like sum of money in the hands of every other citizen of the state is by the state law subject to such seizure. Their argument would be entitled to serious consideration if it appeared that such is the intent and scope of the federal statute. But such is not the meaning of that statute; it does not attempt to invade the domain of state legislation in respect to exemptions; its simple and obvious purpose is, to protect the donation while in transit to the pensioner. Its language is not, 'no money in the hands of a pensioner,' or 'no pension money,' but 'no sum of money *due* or to *become due* to any pensioner.' The protection is to an undelivered sum of money. This, which is implied in the first words of the section, is made more clear by its after language, for it prohibits seizure whether this sum of money due or to become due remains with the pension office or an officer or agent thereof, or in the course of transmission to the pensioner entitled thereto. To guard against any abuse or destruction, it thus specifies the various positions which money due or to become due can occupy, and in effect declares that pension money shall not be interrupted on its way to the pensioner. The last clause of the section, which reads, 'but shall inure wholly to the benefit of such pensioner,' is qualified by and must be read in the light of the preceding words of the section. It is comprehensive language, but it is only language strengthening and making more plain the intention of the preceding words. It applies to money due or to become due, and not to money paid and in possession. Nowhere in the section is there reference to pension money in the hands of the pensioner. It does not purport to exempt money in such hands from the operation of state laws, either those of taxation, or the ordinary statutes concerning exemptions and indebtedness." (*Cranz v. White,* 27 Kan. 319, 320.)

The case of *McIntosh v. Aubrey,* 185 U. S. 122, was an action in ejectment based on a title derived from the sale of land under an execution for debt, where the land had been purchased with pension money. It went from the supreme court of Pennsylvania to the United States supreme court upon a writ of error. In the opinion it was said:

"The plaintiff in error claims that the property having been purchased with pension money it was exempt from seizure and sale on execution under section 4747 of the Revised Statutes of the United States. . . . The language of the section of itself seems to present no difficulty, and if doubt arises at all it is only on account of the decisions of courts whose opinions are always entitled to respect. *Crow v. Brown,* 81 Iowa 344; *Yates Co. National Bank v.*

*Carpenter,* 119 N. Y. 550. But notwithstanding, we think the purpose of congress is clearly expressed. It is not that pension money shall be exempt from attachment in all of its situations and transmutations. It is only to be exempt in one situation, to wit, when 'due or to become due.' From that situation the pension money of plaintiff in error had departed.

"The simplicity and directness of the statute are impaired by attempts to explain it by the use of other terms than its own. That money received is not money due, and that real estate is not money at all would seem, if real distinctions be regarded, as obvious enough without explanation. Nor are legal fictions applicable. Undoubtedly the law often regards money as land and land as money, and, through all the forms in which property may be put, will, if possible, trace and establish the original ownership. But these are special instances depending on special principles, and cannot be made a test of the purpose of congress in enacting section 4747.

"We concur, therefore, with the learned judge of the court of common pleas of Pennsylvania, that 'the exemption provided by the act protects the fund only while in the course of transmission to the pensioner.' When the money has been paid to him it has 'inured wholly to his benefit,' and is liable to seizure as opportunity presents itself." (p. 124.)

From these opinions it will be readily observed that the construction was reached by giving a meaning and significance to the words in the statute, "money due or to become due." These particular words are not used in the world war statute, section 454, but the word "payable" is used apparently to express the same or similar situation. With the very complete meaning of the term "due or to become due," as expressed in the opinions above cited, we can compare the definitions of the word "payable" used twice in section 454, the following being some of the generally accepted and well-recognized definitions of that word: justly due; may, can or should be paid; matured, or maturing; due; to be paid; which may be paid; not equivalent to paid; capable of being discharged by payment; that can or will be paid; capable of being paid; legally enforceable; suitable to be paid; that may be discharged or settled by delivery of value; that can or should be paid. It is argued on behalf of the plaintiff that these definitions summarized mean "agreed to be paid," so that it would read the "allowance agreed to be paid." This expression could apply to a situation that is completely past as well as something yet to be done. A note agreed to be paid a year ago and was then paid is surely not "payable." An allowance agreed to be paid to the minors and has been paid is not "payable," as we ordinarily use and understand the word. The above definitions certainly convey the idea of something that is due, mature, capable of being paid, to be paid, something not yet

done. If such is the reasonable, usual, ordinary and correct meaning of the word "payable" it is certainly very much akin to the term in the old law "due or to become due." We think this is the reasonable, fair and intended meaning of the word "payable," as used in the new statute. So that the allowance due under titles II, III and IV, or the allowance to be paid under titles II, III and IV, respectively, shall not be assignable, etc. Again, how could an allowance or compensation that had already been paid be "assignable." To give the word "payable" any other or different meaning from the general equivalent of "due," or "to be paid," or "capable of being paid," would be giving it an unusual and strained construction.

Plaintiff cites the following cases placing a construction upon the new law, in reference to exemptions from executions and garnishments: *Payne, Administrator, v. Jordan et al.*, 152 Ga. 367, and *Wilson v. Sawyer*, 177 Ark. 492. The former was on the act of 1918, which in effect is the same as section 454 of the act of 1924. After making a statement of the question involved and giving a copy of the statute the court concluded as follows, which constitutes the entire opinion:

"*Held:* Giving effect to the clear and manifest intention of congress as expressed in the war-risk insurance act, as set out in the above question, the money paid over to a beneficiary, although deposited by her in bank, is not subject to garnishment. The purpose of the act is not merely to protect an allotment, made under the act, from legal process while in the hands of the government, or its agencies, but to preserve the allotment itself from legal process against the beneficiary, except as against the claims of the government itself."

The other case was decided in 1928, the syllabus of which is as follows:

"Money paid to a disabled soldier under guardianship by virtue of the world war veterans' act (38 U. S. C. A., § 421 *et seq.*) *held* not subject to garnishment, whether in the hands of the soldier or his guardian; § 22 of the act (38 U. S. C. A., § 454) providing that the compensation paid shall not be subject to the claims of creditors."

It cites the Georgia case, *supra*, which seems to have gone to the court of appeals in Georgia and was there affirmed and is reported in 36 Ga. App. 787.

A more recent Georgia case, *Mobley v. Jackson*, 40 Ga. App. 761, which involves the question of exemption of a Confederate pension, refers to the decision in the Jordan case, *supra*, and to the case of

*McIntosh v. Aubrey,* supra, as to the construction placed by the United States supreme court in the latter case upon the federal statute, and adds on page 763—

"Our own statute, however, is broader in its scope and requires a different construction."

It was held in the case of *Y. C. N. Bank v. Carpenter,* 119 N. Y. 550, under a state statute that pension money invested in a home and not mingled with other funds was exempt from execution. It does not attempt to construe the federal statute.

Plaintiff cites the criminal case of *United States v. Hall,* 98 U. S. 343, where a guardian had embezzled the funds of his ward and was convicted under the penal provision of the civil war act of congress. The defense there was that the penal section was unconstitutional and void, and the court for the following six reasons held otherwise:

"1. Because the United States, as the donors of the pensions, may, through the legislative department of the government, annex such conditions to the donation as they see fit, to insure its transmission unimpaired to the beneficiary. 2. Because the guardian no more than the agent or attorney of the pensioner is obliged by the laws of congress to receive the fund; but if he does, he must accept it subject to the annexed conditions. 3. Because the word 'guardian,' as used in the acts of congress, is merely the designation of the person to whom the money granted may be paid for the use and benefit of the pensioners. 4. Because the fund proceeds from the United States, and inasmuch as the donation is a voluntary gift, the congress may pass laws for its protection, certainly until it passes into the hands of the beneficiary, which is all that is necessary to decide in this case. 5. Because the elements of the offense defined by the act of congress in question consist of the wrongful acts of the individual named in the indictment, wholly irrespective of the duties devolved upon him by the state law. 6. Because the theory of the defendant that the act of congress augments, lessens, or makes any change in respect to the duties of a guardian under the state law is entirely erroneous, as the act of congress merely provides that the pension may be paid to the person designated as guardian, for the use and benefit of the pensioner, and that the person who receives the pension, if he embezzles it or fraudulently converts it to his own use, shall be guilty of a misdemeanor, and be punished as therein provided." (p. 357.)

This decision was based largely upon the decision rendered by the same court involving an act indirectly connected with bankruptcy proceedings in the case of *United States v. Fox,* 95 U. S. 670, where it was held:

"It is competent for congress to enforce, by suitable penalties, all legislation necessary or proper to the execution of powers with which it is intrusted;

and any act committed with a view of evading such legislation, or fraudulently securing its benefits, may be made an offense against the United States." (Syl. ¶ 2.)

The Arkansas case, heretofore cited, was a guardian case, but it does not refer to the decision in the Hall case and it makes no distinction whatever between the pension money being in the hands of the beneficiary or a guardian. The Manning case in Iowa was also a guardian case and the Hall case was mentioned at length in it, the comment and conclusion of which has been heretofore noted. A later Iowa case, *Tama County v. Kepler*, 187 Ia. 34, is also a guardian case which approves the decision in the Manning case and refers to the Hall case as holding that the pension when sent by the government to a guardian was still under the control and management of the government.

It is pertinent and significant to observe the natural and proper leaning toward an interpretation which is in perfect harmony with the local legislation of each of three of the four states from which these strong decisions come.

We think it would be carrying the Hall decision to a greater length than apparently intended to consider it as holding that the government was in every way in control of and responsible for the pension funds until they reached the hands of the beneficiary through the hands of a guardian. Punishment for an offense is a regulatory right far different from the responsibility of the government for the performance and fulfillment of a business or financial obligation. Would anyone contend that the government still owes the ward of Mr. Hall, the guardian, for the pension money he misappropriated? Does the responsibility rest the same on the government to finally get the money into the hands of the ward when the guardian embezzles it, as if it were embezzled by a clerk in the pension office when in his hands to send to the beneficiary? Certainly not, and the decision in the Hall case extends the control to that which regulates by supervision and punishment, but not so far as to make the government financially responsible to the ward, which would in effect be a guarantee.

The act under consideration in section 426 prescribes the powers and duties of the officers of the United States Veterans' Bureau. Section 450 provides that where any payment under the act is to be made to a minor, such payment may be made to the person who is constituted guardian by the laws of the state or residence of

claimant, that whenever it appears to the director of the bureau that any guardian is not properly executing his duties he may appear in the court which appointed the guardian and make proper presentation of such matter to the court, and further that he may in his discretion suspend payments to any such guardian who neglects or refuses to make reports as requested. Section 556 prescribes the penalty for embezzlement by a guardian. None of which provisions, nor all of them together, indicate that the intention back of such legislation was the full responsibility and control of the government until the funds reached the hands of the ward.

The general theory of the law with reference to funds and property intended for minors is that both title and possession are in the ward while under the charge and control of the guardian.

"While the relation between guardian and ward is that of trustee and *cestui que trust,* the trust is not of such character as to give the guardian the legal title to the ward's estate, but the title remains in the ward, and the possession of the guardian is the possession of the ward." (28 C. J. 1128.)

"The legal title, however, is in the ward rather than in the guardian; so that upon the death of the guardian the funds of the ward do not pass to his executor, and on a change of guardians no transfer of title takes place. His possession is deemed the possession of the ward." (12 R. C. L. 1123.)

We conclude that the intervention of a guardian does not leave the pension funds still in the hands of the government so that they are still "payable" or "due" the ward as expressed by section 454 so as to exempt them from assignment, execution and taxes, but when paid to the guardian the title and possession have both passed from the government and they are no longer "payable" and consequently not entitled to any exemption from taxes under section 454.

The briefs discuss the right of the state to exercise its right to impose a tax upon a governmental agency, but the cases cited are where no exemption is specified as in this case, so we need not go further into that branch of the question.

It does not appear to be necessary to go further in this case, but with reference to the investment of funds in property or securities, which is argued in the briefs, we might call attention to the following ruling in the case of *Pefly v. Reynolds, Sheriff,* 115 Kan. 105, 222 Pac. 121:

"Under statutes providing that life insurance policies, including fraternal beneficiary certificates, shall inure to the sole use of the beneficiaries and shall be free from all taxes and the claims of creditors of the persons named in such policies, and that the money paid by any fraternal beneficiary association

shall not be appropriated by any legal or equitable process to pay any debt of the beneficiary, no exemption is created with respect to property purchased by the beneficiary with money paid upon a life insurance policy or beneficiary certificate." (Syl.)

The writ of quo warranto is denied.

SMITH, J., not participating.