LESTER E. SHIPPEE, BANK COMMISSIONER, *vs.*
COMMERCIAL TRUST COMPANY.

MALTBIE, C. J., HAINES, HINMAN, BANKS AND AVERY, JS.

Argued May 13th—decided July 12th, 1932.

*John A. Danaher,* for the appellant (claimant).

*Donald Gaffney,* with whom, on the brief, was *Bernard F. Gaffney,* for the appellee (the receiver).

BANKS, J.   James A. Callery was a veteran of the World War and as such became entitled to certain compensation and disability benefits under the "World

War Veterans Act, 1924," as amended. In 1921, he was found to be mentally incompetent and was committed to the Connecticut Hospital for the Insane at Middletown, and his father, James T. Callery, was appointed conservator of his estate. From time to time payments of compensation and disability benefits due to James A. Callery were made by checks payable to the "Estate of James Callery, James T. Callery, Conservator," in the total amount of $7000, which were deposited by the conservator in the savings department of the Commercial Trust Company. Thereafter the conservator withdrew these funds from the savings department and invested them in four "industrial certificates of deposit" of the Trust Company which were issued by it "to the estate of James Callery, James T. Callery, Conservator." The Commercial Trust Company is in receivership, and demand was made upon the receiver that the certificates of deposit receive priority, and the funds represented thereby be paid over to the conservator of James A. Callery. The trial court held that these funds were not entitled to a preference from the assets of the defendant in the hands of the receiver.

The position of the claimant is that, in receiving, as conservator, funds payable to his ward under the Federal statutes because of his disability, he is acting merely as the agent of the government, and that the moneys thus payable are at all times funds of the United States in transit to the veteran until the latter actually receives them himself. He claims, therefore, that, since these funds, payable to his ward and received by the conservator on his behalf, never came into the actual possession of the ward, they are still moneys of the United States in transit to the ward, and as such entitled to priority in the distribution of the assets of the defendant Trust Company.

The World War Veterans Act, 1924, Chapter 320, § 21, 43 U. S. Stat. at Large, 613, U. S. C. A., Title 38, § 450, as amended, Cumulative Supplement, 1931, p. 567, provides in part as follows: "Where any payment under this chapter is to be made . . . to a person mentally incompetent, or under other legal disability adjudged by a court of competent jurisdiction, such payment may be made to the person who is constituted guardian, curator, or conservator by the laws of the State or residence of claimant, or is otherwise legally vested with responsibility or care of the claimant or his estate." Section 454, Title 38, U. S. C. A., provides in part as follows: "The compensation, insurance, and maintenance and support allowance payable . . . [under the Act] shall not be assignable; shall not be subject to the claims of creditors of any person to whom an award is made, . . . and shall be exempt from all taxation." Section 450 of the Act further provides that if the conservator is not, in the opinion of the director of the veterans bureau, properly executing the duties of his trust, the director may appear in the court which has appointed such fiduciary and make presentation of such matters to the court; that the director may, in his discretion, suspend payments to a conservator who neglects to render an account, and that any part of the compensation, the payment of which is thus suspended, may be paid temporarily to the person having custody and control of the incompetent. It also provides that any funds in the hands of a conservator which, under the laws of the State wherein the veteran had his last legal residence would escheat to the State, shall escheat to the United States.

These and other analogous provisions of the Act evidence the solicitude of the Congress for the welfare of the veteran who has become mentally incompetent

to manage his own affairs, and an intention to safeguard the payment to him of the compensation and disability benefits to which he might be entitled under the Act so that they should not be dissipated or the veteran deprived in any way of their full benefit. We do not, however, find in the Act any intention, express or implied, that the title to the moneys payable to him is to remain in the United States after they have been paid over to his conservator, and until they have been actually paid into the hands of the ward, or disbursed for his benefit. We find no justification in the Act for the claim that the conservator acts merely as the agent of the government through whom the funds are paid to his ward. A conservator is appointed by the Court of Probate for one who is incapable of managing his affairs, and his duty is to manage the estate of his ward and to apply it to his support and that of his family. General Statutes, §§ 4815, 4819. The care and management of the ward's estate is primarily entrusted to the Court of Probate and the conservator is in many respects but the arm or agent of the court in performance of the trust and duty imposed upon it. *Johnson's Appeal,* 71 Conn. 590, 598, 42 Atl. 662. The World War Veterans Act recognizes this status of the conservator in the provision that, when he has been derelict in the performance of his duties, the director of the veterans bureau may appear in the court which appointed him and make presentation of such fact.

No doubt Congress might have provided that money paid by the government for the benefit of a soldier who was incompetent to manage his own affairs should not come into the hands of a guardian appointed by a State court, but should be held and disbursed on account of the beneficiary by some agency of the United States, as is done in the case of certain Indian

tribes. In such case the United States itself is the guardian of the Indian upon the reservation, and when it causes money received by it through its officer for the use of the Indian to be deposited to its credit in a bank, the money is that of the United States, and it is entitled to priority of payment out of the funds of the bank. *United States F. & G. Co.* v. *Bramwell*, 295 Fed. 331, affirmed, 269 U. S. 483, 46 Sup. Ct. 176. The World War Veterans Act does not so provide, but does provide for the payment of the benefits due an incompetent veteran to his guardian or conservator appointed by the State court. When such funds come into his possession the title to them vests in the ward, and the possession of the guardian or conservator is deemed to be the possession of the ward. 28 C. J. 1128; 12 R. C. L. 1123. These funds were paid to the "Estate of James Callery," and upon their receipt by the conservator title to the funds vested in James A. Callery, but, because of his incompetence, their care and management was in the hands of his conservator appointed by the Court of Probate.

That the title to the funds vested in the ward is recognized by the provision in the Act that when such funds would, under the law of the State where the ward resided, escheat to the State, they shall escheat to the United States. The provisions of § 454 of the Act that allowances payable thereunder shall not be assignable or subject to the claims of creditors, and shall be exempt from taxation, do not tend to support the contention of the claimant that after such funds have been paid to the representative of the person to whom they were payable they still remain moneys of the United States. Revised Statutes, § 4747, Title 38, § 54, U. S. C. A., provides that no money due or to become due to any pensioner shall be liable to attachment or levy under legal process "but shall inure

wholly to the benefit of such pensioner." This statute protects pension money from attachment so long as it remains due to the pensioner, but not after it has been actually paid over, and has come into his possession. *Price* v. *Society for Savings*, 64 Conn. 362, 365, 30 Atl. 139; *McIntosh* v. *Aubrey*, 185 U. S. 122, 22 Sup. Ct. 561. Nor after it has been paid to the agent of the pensioner, for it is no longer "money due or to become due." *Kellogg* v. *Waite*, 94 Mass. (12 Allen) 529. In *Manning* v. *Spry*, 121 Iowa, 191, 96 N. W. 873, it was held that pension money in the hands of the guardian of the pensioner was exempt from taxation under this statute, following a previous holding in that State that property purchased with pension money was exempt from levy and sale under execution, which it was conceded was contrary to the weight of authority elsewhere. The Iowa court held that the guardian was nothing more than the agent of the government and that the pension money in his hands was still under its control and management. In *State ex rel. Spillman* v. *First State Bank*, 121 Neb. 515, 237 N. W. 623, the court, citing and relying on the Iowa case, held that war risk insurance money deposited by a guardian in a bank was money of the United States, and entitled to priority in the distribution of the assets of the bank. We are unable to follow the rulings in these cases to the extent of holding that the claimant as conservator is the agent of the government, and that the securities held by him in which he has invested the funds paid to the estate of his ward are moneys of the United States which after all these years are still in transit to his ward. We do not understand such result to be required by the decision in *United States* v. *Hall*, 98 U. S. 343, cited upon the claimant's brief, which held that Congress had the power to declare that a guardian of a pensioner, who embezzled the pension money in his

hands, was guilty of an offense against the United States. Its holding that Congress might pass laws for the protection of the pension money while in the hands of a guardian of the pensioner, is far from ruling that by so doing it prevented the title to the money from passing to the pensioner when it was paid over to his guardian. In *State ex rel. Smith* v. *Shawnee County Comm'rs.* (1931) 132 Kan. 233, 294 Pac. 915, (certiorari denied, 51 Sup. Ct. 648, 75 L. Ed. 1462) it was held that none of the provisions of the World War Veterans Act indicate an intention to retain full control and responsibility in the government for benefits payable to an incompetent veteran until they reach his hands, and that when such funds are paid to his guardian title and possession have both passed from the government, and they are no longer "payable" and consequently not entitled to exemption under § 454 of the Act.

The claim of priority for the funds of the estate of James A. Callery invested in these industrial certificates of deposit of the Trust Company, in the distribution of its assets, is based solely upon the proposition that they are still funds of the United States in transit to the veteran. Our holding that such is not their status requires the conclusion that the trial court did not err in denying them priority in the distribution of the assets of the defendant Trust Company.

There is no error.

In this opinion MALTBIE, C. J., and HINMAN, J., concurred.

HAINES, J. (dissenting). My inability to concur in the majority opinion arises in part from the differing interpretation which I put upon the opinion of the Supreme Court of the United States in *United States*

v. *Hall, supra,* and related cases. The fundamental and decisive question upon this appeal is whether the guardian held this pension money as an agent or trustee for the United States, or whether he was the direct representative of the pensioner by virtue of his State appointment. The majority opinion holds that the money when paid into the hands of the guardian by the United States was in legal effect paid to the incompetent pensioner himself and became his sole property. It follows from the latter view that its control and use are regulated by the authority which is vested in the guardian by the law of the State appointing him. Under that law, if money due on a debt to this incompetent were paid to his guardian it *would* be in legal effect paid to the incompetent himself, since the guardian is appointed by the State to act for him and in his place.

If money is not due an incompetent upon a legally enforceable obligation, however, but is a voluntary contribution by a third party for the benefit of the incompetent, it is manifestly not within the power of the guardian to compel its payment to himself. If a relative, for example, desired to create a fund for the care and support of the incompetent, he could not be required to pay it into the hands of the guardian for that purpose, but the donor may appoint his own agent to carry out the purpose to which the money is to be applied, and the agent thus appointed would be responsible for his acts to the donor as his principal.

A pension has been defined as a mere bounty or gratuity given by the government and intended for the personal benefit of the pensioner and his dependents, and it involves no claim of right on the part of the pensioner. *Frisbie* v. *United States,* 157 U. S. 160, 166, 15 Sup. Ct. 586; *United States* v. *Teller,*

107 U. S. 64, 2 Sup. Ct. 39; *Manning* v. *Spry,* 121 Iowa, 191, 194, 96 N. W. 873.

It follows that the government may annex to its payment such conditions and impose upon the agent of its own selection, to whom it is paid, such obligations as it sees fit, irrespective of any obligations which may be imposed upon the same person by a guardianship appointment by the State. References to portions of the opinion in *United States* v. *Hall* are pertinent: "Power to protect the fund from misappropriation, fraud, and unauthorized conversion to the use of another, and to secure its safe and unimpaired transmission to the beneficiary, has been claimed and exercised through the whole period since Congress, under the Constitution, commenced to grant such bounties." (p. 349.) It is within the power of Congress to "pass laws to protect the fund appropriated for such a beneficiary of the government, certainly until it reaches his hands. Congress in many cases has passed such laws, and provided that the money shall not be transferable or subject to attachment, levy, or seizure, even after it has been received by the agent, attorney, or guardian." Though these provisions may not be in conformity to a State law, it is said of this control of pension money in the hands of one who is acting for an incompetent pensioner, that "no court ever called the Federal exemption in question because it was something in addition to what was contained in the State law, nor because the operation of the Act of Congress was extended beyond the time when the money was received by the agent, attorney, or guardian of the pensioner." (p. 351.)

Pensioners are wards of the United States, and the numerous provisions made by Congress for the control of pension money in the hands of an agent, attorney or guardian of such ward "are sufficient to

prove that . . . it has been the policy of Congress to enact such regulations as will secure to the beneficiaries of the pensions granted the exclusive use and benefit of the money appropriated and paid for that purpose. . . . The national legislature has been constant and vigilant in endeavors to protect their interest and secure to them the use of the annuities and pensions granted in their behalf." (pp. 352, 353.) It thus appears that "it has been the unchallenged practice of the legislative department of the government, with the sanction of every President, including the Father of the Country, to pass laws to prevent the diversion of pension money from inuring solely to the use and benefit of those to whom the pensions are granted," and "most of these regulations have been enacted to prevent agents, attorneys, and guardians from withholding the fund or converting the same to their own use before it passes into the hands of the beneficiary." (p. 354.) It is manifest that this control relates to that period of time which intervenes between the payment into the hands of the guardian and the actual application of the money to the sole use and benefit of the ward. The foregoing quotations amount to a definite statement that while the money remains in the hands of the guardian it is deemed not to have reached the hands of the beneficiary.

In the case from which we quote, the money which had been paid to the guardian by the United States had been misappropriated, and the guardian, who was an appointee of the State of Ohio, was being prosecuted under a Federal statute for his offense. The court said that the conditions attached to pension money "did not apply to the money after the same had passed into the hands of the pensioner, which is a question that does not arise in this case." (p. 355.) Here again is a clear recognition of the legal proposi-

tion that the payment which had been made to the guardian was *not* payment to the pensioner, as would have been the case of a payment made under the law of the State of the guardian's appointment.

Moreover, this question was specifically raised in the *Hall* case, one of the contentions being that when the payment was made to the guardian the money ceased to be within the constitutional control of the United States, to which the court replied: "The court is unhesitatingly of a different opinion." Among the many reasons given for this conclusion were, that the United States is the donor of the money; and because the guardian did not receive the money under compulsion but voluntarily; and, finally, because the word "guardian" as used in the Act of Congress, is merely the designation of the person to whom the money "may be paid for the use and benefit of the pensioners." (p. 357.) The court further said that because it was a voluntary gift by the United States, Congress could protect it by statute until it passed into the hands of the beneficiary, and held it had not reached the beneficiary in that case, although it was conceded to be in the hands of the guardian.

In accord with this view is *United States F. & G. Co.* v. *Bramwell,* 295 Fed. 331, affirmed in 269 U. S. 483, 46 Sup. Ct. 176.

Decisions by the Supreme Court of the United States as to the meaning and intent of Federal statutes are of controlling importance in the courts of the States. Many of the State courts have adopted the same view of the effect of these Federal provisions. *Manning* v. *Spry,* 121 Iowa, 191, 96 N. W. 873, 875; *State ex rel. Spillman* v. *First National Bank* (1931) 121 Neb. 515, 237 N. W. 623; *State ex rel. Sorensen* v. *Security Bank* (1931), 121 Neb. 521, 237 N. W. 620; *In re Murphy's Committee* (1929) 236 N. Y. Sup. 343;

*In re Hallbom's Estate* (1930) 179 Minn. 402, 229 N.
W. 344; *Tax Commission of Ohio,* v. *Rife* (1927) 27
Ohio App. 516, 162 N. E. 398; *Reiff* v. *Mack,* 106 Pa.
St. 265, 28 Atl. 699; *Geier's Succession* (1924) 155 La.
167, 99 So. 26; *Payne* v. *Jordan,* 152 Ga. 367, 110 S. E.
4; *Tama County* v. *Kepler* (1919) 187 Iowa, 34, 172
N. W. 912. In *Manning* v. *Spry, supra,* the Supreme
Court of Iowa interpreted the decision in *United
States* v. *Hall* to be that a guardian appointed under
State authority was nothing more than an agent of
the government and having accepted the money volun-
tarily he had become amenable to the laws of Con-
gress. Upon that conclusion the Iowa court said: "It
is clear, we think, that the money has not passed into
the hands of the pensioner, although paid to his
guardian, and by him loaned out for safekeeping, and
to secure some return therefrom. So long as the fund
remains subject to the control and jurisdiction of the
federal government, the State has no right to impair,
direct, or control it. It is doubtful if a guardian could
be punished by the State courts for mismanagement
of pension money. . . . He acts as a government offi-
cial or agent, and not primarily for the court appoint-
ing him. . . . It [the money] has not reached the
beneficiary until actually paid to him or expended for
his benefit. While in the guardian's hands, he is a
mere trustee or depositary for the general govern-
ment." I interpret the *ratio decidendi* of these deci-
sions to be that the guardian is a trustee or agent of
the United States, and that the money remains at all
times the property of the United States until actually
applied to the care of the pensioner; the purpose of
its payment to the guardian is then and only then ac-
complished. I regard Callery as the voluntarily se-
lected representative of the United States to receive
and use this pension money as directed by the United

States; having voluntarily accepted that trust, he was acting for and under the control of the United States in that regard and not under any authority conferred by his State appointment as guardian or conservator. He was bound to make such use and disposition of the money put into his hands as the United States might direct and not as he may have been directed by the authority of the State of his appointment. It results that the money, not having been applied to the use and benefit of a ward as required by the United States, but held and deposited by the agent of the latter, it remains the property of the United States, now in the Commercial Trust Company, which must be accorded priority in the payment from the funds of that company. "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all debts due from the deceased, the debts due to the United States shall be first satisfied." United States Rev. Stat., § 3466. Of this statute the Federal courts have said: " 'All debtors to the United States, whatever their character, and by whatever mode bound, may be fairly included within the language used. . . . And it is manifest, that Congress intended to give priority of payment to the United States over all other creditors, in the cases cited therein. . . . As this statute has reference to the public good it ought to be liberally construed.' " *Bramwell* v. *United States F. & G. Co.,* 269 U. S. 483, 487, 46 Sup. Ct. 176; *Beaston* v. *Farmers Bank,* 37 U. S. (12 Pet.) 102; *United States* v. *Herron,* 87 U. S. 251; *Marshall* v. *New York,* 254 U. S. 380, 41 Sup. Ct. 143.

This money was paid to the guardian Callery under the World War Veterans Act of 1924 (June 7, 1924), Chapter 320, appearing in Title 38, U. S. Code Anno., p. 193. Section 434 of Title 38 makes the director of

the veterans bureau responsible "for the proper examination, medical care, treatment, hospitalization, dispensary, and convalescent care," etc., and other services necessary for the pensioner. Section 450 of Title 38, now found in Cumulative Supplement for 1931 to Title 38, provides, among other things, that the payment of the pension money "may be made" to a conservator or guardian who has been appointed by the State wherein the ward is domiciled, and if he fails to render accountings to the director showing the application of the money for the benefit of the pensioner, the director, in his discretion, may suspend such payment to the guardian. It is also there provided that such payments of pension money as have not been turned over to the institution in which the incompetent pensioner may be an inmate, may be held in the treasury to the credit of the pensioner and may be disbursed by the director in his discretion. Pension money which has been paid to a guardian which might otherwise escheat to the State under a State law, shall be returned to the United States by the guardian to be credited to current appropriations for payments of compensation insurance. Under § 556 of Title 38 (U. S. C. A. p. 266) a guardian is criminally liable to the United States for misuse of the pension money in his hands. I think it is apparent that Congress intended to prevent pension moneys of the United States donated by it for the care and support of its wards, from being appropriated to any other purpose before that care and support is actually given, or, if competent, the money actually paid into his hands. This money was originally paid by the treasury of the United States directly into the savings department of the Trust Company, the checks forwarded to the dependent having been drawn on the treasury. The Trust Company knew the source and nature of the

fund, and its receiver is now seeking the advice of the court as to his duty in regard to it. Thus received, the Trust Company became, in legal effect, invested with the title as a trustee for the United States and bound to repay the money as a first claim upon its assets. *Beaston* v. *Farmers Bank, supra.* The result of the majority opinion in this case permits the diversion by State authority of a large portion (eighty-five per cent) of the $7000 which was in the hands of the guardian, to the payment of the obligations of the defendant Trust Company, the very result which Congress has sought to make impossible. It thus deprives a dependent ward of the Federal government of $5950 donated by the latter for his support and care.

I regard the conclusion of the trial court as erroneous, and it should be reversed.

In this opinion AVERY, J., concurred.