CITY OF ATLANTA *v.* STOKES *et al.*

No. 8932. JULY 20, 1932.

202

204

*J. L. Mayson, C. S. Winn,* and *J. C. Savage,* for plaintiff in error.
*J. C. Miner, J. A. Setze,* and *J. S. Hall,* contra.

RUSSELL, C. J. (After stating the foregoing facts.) If the question proposed for solution in this case were whether the State alone is empowered to levy taxes upon the property of its citizens, it should of course be answered in the affirmative. But the general rule as to taxation, like every other general rule, is subject to exceptions. In a broad sense, Federal regulations as to direct taxation upon tangible property are not permissible. Except in well-defined instances, the power of levying direct taxation is a right reserved in express terms to all the commonwealths which as sovereign States compose this union. All the propositions so well stated in the opinion of the dissenting Justices, if confined simply to the ordinary rules governing taxation, may well be conceded. In the field of direct taxation the power of the sovereign State is supreme, except when the exercise of that supreme right brings it into collision with the operation of a government instrumentality necessary to the existence of the Federal government and the exercise of its powers upon a subject as to which exclusive jurisdiction was delegated to Congress in the constitution of 1789. In the previous utterance by this court upon the same subject now before us, in *Rucker* v. *Merck,* 172 *Ga.* 793 (159 S. E. 501), the decision of the majority of the court as then constituted was not based upon any power of taxation inherent in Congress; for it was not imagined that Congress, in the passage of § 9127-1/2-22 (U. S. Comp. St. 1925, 722), was attempting to impose a tax; but the court held, basing its decision upon the admitted and unlimited right of Congress to make war, that Congress had the supreme right to say (without let or hindrance of any kind from any quarter) upon what terms it would reward faithful service in time of war as an instrument for the continuance of like faithful service if the need of the future should demand. As we still see the question here involved, it is not one of taxation, but a question as to whether the Federal government has the right to determine, even to the minutest detail, what shall be the measures by which and the manner in which a war shall be begun, carried on, and concluded. To maintain the power

to wage war, it is as much essential to the morale of the troops of a government that those who face death upon the field of Mars should have the right to anticipate rewards in the future (especially if they have been victorious) as to expect that they will receive the monthly compensation for service, which must be meager indeed in instances when their lives are actually exposed to danger. It seems strange, in view of the long line of decisions on this subject, that any one can suppose, even though the power of a State to tax generally is supreme, that that power may be used to hamper, hinder, annoy, harass, and impede the Federal government in the exercise of its unlimited power to carry on war. Certainly no State should complain of the terms upon which the Federal government rewards its soldiers, when the compensation, insurance, and maintenance and support allowance given them under the Federal statute with which we are now dealing is an acquisition and addition to the property of the State, which would never have existed but for the liberality of the Federal government in grateful recognition of the services of citizens of each and all the States. The exercise of this war power does not relieve from taxation anything except the compensation which is sent into the State as a reward to soldiers for their services. If it were an attempt of the Federal government *to relieve* from taxation (as seems to be argued in the dissenting opinion) a portion of the property in the State previously subject to taxation, the case would be altogether different.

But let us suppose the Federal government pays a veteran a thousand dollars, which before the gift had never been subject to taxation anywhere and had never been in Georgia to be taxable, is the State injured by the governmental policy? The Federal power to make war is, in our opinion, long enough and strong enough to impose conditions which the Federal government may think proper in order to protect the Federal bounty from deduction by the power of the State to tax. But however this may be, the practical result has not been affected by a single cent; because, if the government had not made the gift which the defendant in error in this case invested in property in Atlanta, the value represented by this gift would not have been within the jurisdiction of the city or the State. It is supposable that Congress knew that its bounty, as expressed in the Federal legislation, if not paid to the veterans in the various States, could not be subject to taxation, because the property would

be non-existent, and that when Congress expressly declared that it "shall be exempt from all taxation," it was very plain that practically no interference with the taxing power of the State was effected. We advert to this merely as illustrative of the fact that under § 9127-1/2-22, supra, there is in fact no interference with the power of the State to tax. However, under the provisions of art. 1, sec. 8, par. 11, of the constitution of the United States it is perfectly plain that the same result would ensue had Congress determined upon legislation promotive of the war which might have interfered with the State's power to tax.

Let us consider the facts of this case in the light of the argument that the State has power by taxation to diminish the reward which the Federal government wishes to give its soldiers. As "the right to tax is the right to destroy," it follows that if a pensioner (moved by the desire to save something for a rainy day) were to retain in money funds paid to him by the Government in cash, without investing it, he would, in a few years, without having enjoyed the use of his Federal aid, have expended a large portion if not all of it in taxes, though he never invested any of it and had no opportunity to make a profit or sustain a loss on the original fund. It is very plain to me that when Congress said that benefits accruing under the provisions of the World War Veterans' act should be "exempt from all taxation," Congress had no thought of affecting the existing State-taxing acts, because the gift was of something which never had been subject to taxation, and of something which, unless transmitted by the Federal government, would never be in the State; and that Congress, under its constitutional power to make war, certainly would have the right to say that "unless we give these benefits upon the condition that they are to be tax-free, we shall not give them at all." I contend that under the constitution Congress has the sovereign right to say just that thing. The very splendid argument of my colleague, Mr. Justice Gilbert, *in support of State sovereignty*, meets my highest approbation. The power under which § 9127-1/2-22 was passed was one which was incorporated in the original constitution, art. 1, sec. 8, par. 11. It has never been questioned by even the most ardent States-rights men. In the exercise of the necessary instrumentalities for the functions of government, every State, every year, by grants to the Federal government of lands for various purposes,

withdraws property from the tax list of the State where it is situated. In the very environs of the City of Atlanta, both at the military reservation and at the Federal prison, lie hundreds of acres which for many years paid taxes to the State of Georgia; but by the cession of this land to the United States it became tax free, not because the State does not need the taxes which were formerly paid, not because the exemption in any way interferes with the general power of the State to tax property, but because there can not be any interference in any way, by any power, State, municipal, or personal, with the Federal functions which the Federal government must be left free to exercise without any interference. Under the national banking act it has been held that the shares of stock of a national bank are exempt from State taxation, though stock in every State bank is subject to that burden.

My brothers who insist that the word "payable" has been construed as contended by them, have apparently overlooked the several decisions where equally respectable courts have holden to the contrary. In the land-grant cases, from which liberal quotations are made in the opinion of the minority, the power of Congress to make war was not in question. The land grants, if made by any power conferred by the constitution, were in the exercise of the power of Congress over interstate commerce and to make public improvements. In none of these grants was there an *exemption from taxation,* such as is expressly declared in the case now before us. The Supreme Court of the United States properly held that the gifts of land as made by Congress carried with them no exemption from taxation; and if Congress had intended that the land grant should be exempt from taxation, it could have provided for the benefit. These cases are not in point in the present instance, because Congress did not choose, in the exercise of whatever power it was exercising, to expressly exempt the donation from all taxation, as was expressly done in the instant case.

The conclusion of the majority in *Rucker* v. *Merck,* supra, was not hastily reached, nor was it expressed without due deliberation. It is true that no extended elaboration or explanation of the Federal statute under consideration was entered into, because sometimes the language of the statute is so plain and unambiguous that construction would seem to be unnecessary. In dealing with the case at that time, the majority of the court was of the opinion that the

words "shall be exempt from all taxation," were reasonably plain. It seems now that the word *"payable"* is the axis upon which the wheels of construction revolve. The members of the court who differ with me say that it is obvious that this means that the proposed donations are exempt from taxation only while they remain in the hands of the government. It is true the courts of a few States have so held. The rulings are cited in the dissenting opinion. We can not join in this distinction, because we can not agree that Congress was so ignorant that they were not already acquainted with the fact that funds of the government, *its own money,* in the hands of its own officers, were altogether exempt from all taxation already, without the necessity of any additional protection. In using the word "payable," the ordinary man, without consulting a dictionary, understands that the affix "able" means that which can or may be, or shall be, or must be in future paid. It therefore denotes that this money which will be paid to some one and to all of the beneficiaries of the Federal legislation, shall be exempt from all taxation after it has been paid and reaches the hands of the beneficiaries. That principle was asserted in *Payne* v. *Jordan,* 152 *Ga.* 367 (110 S. E. 154), in which Mr. Justice Hill, delivering the opinion of the court, held that money which had been paid to a beneficiary under this same law (and *after having been* paid), and the fund *being no longer due* (italics ours), but which had been by the beneficiary deposited with a bank, was not subject to garnishment. The opinion in that case was participated in by Mr. Chief Justice Fish, Mr. Presiding Justice Beck, Mr. Justice Hill, and Mr. Justice Hines. It is therefore unnecessary for us to define the future aspects of the word "payable" as used in the statute before us. It needs only to be remarked in passing that the use of words denoting future action, in almost all of the penal statutes of this State, does not exempt from the punishment designed by law one who does any of the acts for which penalties are proposed in future. The case of *Payne* v. *Jordan,* 28 *Ga. App.* 151 (110 S. E. 452), which was decided in accordance with answers to certified questions from the Court of Appeals, delivered by Mr. Justice Hill in *Payne* v. *Jordan,* 152 *Ga.* 367, and which was followed by the opinion of Judge Bell in *Payne* v. *Jordan,* 36 *Ga. App.* 787 (138 S. E. 262), has been several times cited: 32 A. L. R. 356; 55 A. L. R. 612; Wilson *v.* Sawyer, 177 Ark. 492 (6 S. W.

(2d) 825), as well as in cases hereinafter referred to. Our attention was called to this fact at the time that the *Merck* case was considered. Justices Atkinson and Gilbert have been consistent as to their definition of the word "payable," for they dissented in the *Jordan* case in 152 *Ga.*, just as they did in *Rucker* v. *Merck*, supra. The writer was not a member of this court when the original certified question was answered in *Payne* v. *Jordan*, supra, nor was Judge Bell a member of the Court of Appeals when that court unanimously followed, in 28 *Ga. App.* 151 (in the opinion written by Judge Jenkins), the instructions of the majority of this court, speaking through Mr. Justice Hill.

As referring to the war power of Congress, it was said in Lajoi *v.* Milliken, 242 Mass. 508 (136 N. E. 419) : "The war powers of the Federal government, under Const. U. S. art. 1, § 8, are extensive, and include, not only matters specifically stated, but others reasonably implied as necessary in waging war to a successful conclusion, including the power to deal with the exigencies created by war, or arising from its inception, progress, and termination." Some decisions from courts of other jurisdiction have been cited by counsel to support the conclusion of plaintiff in error that the funds which Congress declares "shall be exempt from all taxation" are only protected while they are still payable, and not thereafter, i. e., that such funds are protected only while in the hands of the Federal government. Decisions are also cited from the Supreme Court of North Carolina, holding that property purchased with the allowances, compensation, etc., conferred by 38 U. S. C. A. § 38, p. 317, is not exempt from State taxation. The construction placed upon 9127-1/2 U. S. Comp. St. by courts of our sister States are at best but persuasive, but the opinions of courts in other jurisdictions are never conclusive. However, so far as we are able to ascertain, the far greater number of courts which have had the question now before us under review concur with us in holding that these rewards for efficient military service provided by Congress, if passed as a war measure, are relieved from all taxation. Moreover, it seems to be a general principle, well settled in Georgia, at least, that a fund or property which is once exempt retains its exemption, no matter how often the form of the property exempted may be transmuted, or how often the character of the investment is changed. The principle as stated in Corpus Juris is "Usually, where proceeds of

exempt property are invested in land, the land is exempt." 25 C. J. 82, § 137. The reports of this court present a leading case in support of this well-settled doctrine, in *Johnson* v. *Redwine*, 105 *Ga.* 449 (33 S. E. 676). And so were we to concede that the exemption provided by the Federal statute in question only refers to the compensation, insurance, etc., so as to protect the fund only while "payable," as that word is construed in the opinion of the minority, still the well-settled Georgia doctrine supporting *Johnson* v. *Redwine*, supra (by a long line of the decisions of this court which are cited), would still protect that reward which Congress obviously intended to be unhampered, and to be for the exclusive benefit of the beneficiaries only. As said in *Broome* v. *Davis*, 87 *Ga.* 584 (13 S. E. 749) : "It is settled law that property paid for in full with other property previously set apart in due and proper manner under the homestead and exemption laws, takes the place of the latter, and is impressed with the homestead character." This principle, laid down in cases involving homestead and exemption rights, is applicable to the question of exempting property which has been purchased with the proceeds of any compensation allowed for services or for injuries reecived in the course of the world war under the provisions of the world war veterans' act (38 U. S. C. A. 217, § 454; U. S. Comp. Stat. 1925, 9127-1/2). If subsequent transfers of the property are made by the Federal beneficiary, the exemption from taxation does not inhere in the property, but follows the fund into property subsequently purchased as long as the original fund can be traced and its location established by proof.

In Wilson *v.* Sawyer, supra, the Supreme Court of Arkansas had under consideration § 22 of the World War Veterans Act (38 U. S. C. A. 454), and held that money paid to a soldier by virtue of this act was not subject to garnishment, whether in the hands of the soldier or guardian, by reason of § 22 of the act providing that the compensation shall not be subject to the claims of creditors. We cite this case because the section of the Federal act with which we are dealing says that "The compensation, insurance, and maintenance and support allowance payable under titles II, III, and IV, respectively, shall not be assignable, shall not be subject to the claims of creditors," as well as that it shall be exempt from all taxation. Inasmuch as the constitution forbids Congress, as a

general rule, to pass any law impairing the obligation of contracts, this portion of the act would be far more objectionable than that exempting the allowance from taxation. The Arkansas court cited, in support of its decision, *Payne* v. *Jordan, 36 Ga. App.* 787 (supra), in which it was held that a house purchased with proceeds only of war-risk insurance was not subject to execution; and the Arkansas court held that funds actually paid by the government to the beneficiary of a life-insurance policy deposited in a bank are not subject to garnishment. In the opinion in *Wilson* v. *Sawyer,* supra, it was said: "We think the manifest purpose of the legislation making provision for world war veterans was to devote the benefactions there provided to the sole use of the beneficiaries, and that the same should not be subject to the demands of creditors, even after the money had come into their hands, or was held by another for their benefit." In Succession of Geier, 155 La. 167 (99 So. 26, 32 A. L. R. 353), where the question was one as to exemption from taxation as in the case at bar, the Supreme Court of Louisiana held that insurance money received under the world war insurance act was not subject to taxation. It is true that the specific point for decision before the court was as to the operation of the state inheritance tax law. But in the opinion the court expressed itself unequivocally in holding that the allotments, compensation, and insurance payable by the Federal government "shall be exempt from all taxation." Upon this subject the court said: "The terms of the act are clear and unambiguous. Summarizing its provisions, there is a positive prohibition against all taxation on money paid out by the Federal government under section 28, art. 2, 3, and 4; and the insurance provision thereof is a contract between the United States, its agents, and the persons designated in the act as the beneficiaries of deceased service men. It is a bar to all State legislation which is in conflict with it." In support of the foregoing opinion, the Louisiana court cited the decision of the Supreme Court of the United States in Plumber *v.* Coler, 178 U. S. 115, 117 (20 Sup. Ct. 829, 44 L. ed. 998), in which it was held: "It is not open to question that a State can not, in the exercise of the power of taxation, tax obligations of the United States." In re Harris' Estate, 229 N. W. 781-782 the Supreme Court of Minnesota held that the rule applicable to inheritance tax was likewise applicable to all forms of taxation.

The proposition seems clear, and it is certainly supported by the decisions of the Supreme Court of the United States, that the Federal government, under the provisions of the constitution of the United States, in the exercise of its exclusive prerogative to wage war, can not be interfered with by State legislation. When the Federal government, in rewarding its soldiers, determines for itself how it will expend the Federal money, and declares that this money shall be protected against transfer or diminution from any quarter, its power under the express terms of the U. S. constitution is exclusive. As said by the great Chief Justice John Marshall, in McCulloch v. Maryland, 4 Wheat. 316, 422-433 (4 L. ed. 579) : "No trace is to be found, in the constitution, of an intention to create a dependence of the government of the Union on those of the States, for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishments of its ends. To impose on it the necessity of resorting to means which it can not control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the constitution. But were it otherwise, the choice of means implies a right to choose a national bank in preference to a State bank, and Congress alone can make the election. . . A law absolutely repugnant to another as entirely repeals that other as if express terms of repeal were used. On this ground, the counsel for the bank place its claim to be exempted from the power of a State to tax its operations. There is no express provision for the case, but the claim has been sustained on a principle which so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds. This great principle is, that the constitution and laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and can not be controlled by them. From this, which may be almost termed an axiom, other propositions are deduced as corollaries, on the truth or error of which, and on their application to this case, the cause has been supposed to depend. They are, 1st. That a power to

create implies a power to preserve. 2d. That a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve. 3d. That where this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme. These propositions, as abstract truths, would perhaps never be controverted. Their application to this case, however, has been denied; and . . a splendor of eloquence and strength of argument, seldom if ever surpassed, have been displayed. The power of Congress to create, and of course to continue, the bank, was the subject of the preceding part of this opinion; and is no longer to be considered as questionable. That the power of taxing it by the States may be exercised so as to destroy it is too obvious to be denied. But taxation is said to be an absolute power, which acknowledges no other limits than those expressly prescribed in the constitution, and, like sovereign power of every other description, is intrusted to the discretion of those who use it. But the very terms of this argument admit that the sovereignty of the State, in the article of taxation itself, is subordinate to and may be controlled by the constitution of the United States. . . In making this construction, no principle, not declared, can be admissible which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy, to remove all obstacles to its action within its sphere, and so to modify every power vested in subordinate government, as to exempt its own operations from their influence. This effect need not be stated in terms. [As it is, however, in § 9127-1/2-22, supra.] It is so involved in the declaration of supremacy, so necessarily implied in it, that the expression of it could not make it more certain. . . The argument on the part of the State of Maryland is, not that the States may directly resist a law of Congress, but that they may exercise their acknowledged powers upon it, and that the constitution leaves them this right, in the confidence that they will not abuse it. . . It is admitted that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. . . But the means employed by the

government of the Union have no such security, nor is the right of a State to tax them sustained by the same theory. Those means are not given by the people of a particular State, not given them by the constituents of the legislature, which claim the right to tax them, but by the people of all the States. They are given by all, for the benefit of all—and, upon theory, should be subjected to that government only which belongs to all. . . The sovereignty of a State extends to everything which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States. We think it demonstrable that it does not. Those powers are not given by the people of a single State. They are given by the people of the United States to a government whose laws, made in pursuance of the constitution, are declared to be supreme. Consequently, the people of a single State can not confer a sovereignty which will extend over them. . . If the States may tax one instrument employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent-right; they may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government, to an excess which would defeat all the ends of government. This was not intended by the American people. . . If the right of the States to tax the means employed by the general government be conceded, the declaration that the constitution, and the laws made in pursuance thereof, shall be the supreme law of the land, is empty and unmeaning declamation."

In Tarble's Case, 13 Wall. 397 (20 L. ed. 597), it was held that the government of the United States and the government of a State are distinct and independent of each other within their respective spheres of action, although existing and exercising their powers within the same territorial limits. Neither government can intrude within the jurisdiction, or authorize any interference therein by its judicial officers with the action of the other. But whenever any conflict arises between the enactments of the two sovereignties, or in the enforcement of their asserted authorities, those of the national government are supreme. Mr. Justice Field, delivering the opinion of the court in Tarble's case, said: "It is

in the consideration of this distinct and independent character of the government of the United States, from that of the government of the several States, that the solution of the question presented in this case, and in similar cases, must be found. There are within the territorial limits of each State two governments, restricted in their spheres of action, but independent of each other, and supreme within their respective spheres. Each has its separate departments; each has its distinct laws, and each has its own tribunals for their enforcement. Neither government can intrude within the jurisdiction, or authorize any interference therein by its judicial officers with the action of the other. The two governments in each State stand in their respective spheres of action in the same independent relation to each other, except in one particular, that they would if their authority embraced distinct territories. That particular consists in the supremacy of the authority of the United States when any conflict arises between the two governments. The constitution and the laws passed in pursuance of it are declared by the constitution itself to be the supreme law of the land, and the judges of every State are bound thereby, 'anything in the constitution or laws of any State to the contrary notwithstanding.' Whenever, therefore, any conflict arises between the enactments of the two sovereigns, or in the enforcement of their asserted authorities, those of the national government must have supremacy until the validity of the different enactments and authorities can be finally determined by the tribunals of the United States. . . Now, among the powers assigned to the national government is the power 'to raise and support armies,' and the power 'to provide for the government and regulation of the land and naval forces.' The execution of these powers falls within the line of its duties; and its control over the subject is plenary and exclusive. . . It is manifest that the powers of the national government could not be exercised with energy and efficiency at all times, if its acts could be interfered with and controlled for any period by officers or tribunals of another sovereignty." See also the opinion delivered by Mr. Justice Story in Martin v. Hunter, 1 Wheat. 304, 319, 322-328 (4 L. ed. 97).

We have shown that the benefit of § 9127-1/2-22 is in the nature of a contract between the Federal government and its soldiers. It is pointed out in numerous decisions that as related to military

service there is no distinction between the rules governing the inheritance taxes and taxes of other kinds. There is no difference in the Federal exemption from taxation, referred to in the statute of the United States with which we are now concerned, between funds provided for the benefit of ex-soldiers, which depend on whether it comes in monthly allotments or is the proceeds of United States life insurance. The State of Massachusetts has a statute taxing "property . . which shall pass by . . gift . . made or intended to take effect in possession or enjoyment after the death of the grantor." In Tyler v. Treasurer, 226 Mass. 306 (115 N. E. 300, L. R. A. 1917D, 633), Mr. Chief Justice Rugg, delivering the opinion, held that "The conclusion is that sums received by beneficiaries in accordance with designations made in contracts of insurance are not subject to the succession tax," citing Burrage v. Bristol County, 210 Mass. 299 (96 N. E. 719); Estate of Bullen, 143 Wis. 512, 523 (128 N. W. 109, 139 Am. St. R. 1114); In re Parsons' Estate, 117 App. Div. 521 (102 N. Y. Supp. 168); Vogel's Estate, 1 Pa. Co. Ct. 352.

In Tax Commissioner v. Rife, 119 Ohio St. 83 (162 N. E. 390), it was held that "The provisions of the world war veterans' act (38 U. S. C. A. § 421 et seq.), relating to the exemption from taxation of insurance payable thereunder, exempt from the State inheritance tax the amount paid to the estate of a deceased soldier." The Supreme Court of Ohio therefore took the same view of the meaning of the word "payable" which this court has heretofore taken in *Payne* v. *Jordan,* and *Rucker* v. *Merck,* supra. After quoting from the statute, "That the compensation, insurance, and maintenance and support allowance payable under titles II, III, and IV, respectively, . . shall be exempt from all taxation" (43 Stat. at L. 607, 613 § 22, June 7, 1924, 38 U. S. C. A. § 454), Mr. Justice Day, delivering the opinion of the court, said: "This contract of insurance was between the government of the United States on one side, and the soldier, Earl Stewart, on the other side. It provided, in substance, that in the event of the death of said Earl Stewart the sum agreed upon, in stipulated amounts, should be paid to the beneficiary named in the policy. Does the fact that the United States government has taken advantage of the statutes of descent and distribution of the State of Ohio to determine who shall receive the funds in question make such fund any less a pay-

ment direct by the United States to such beneficiaries, provided they are within the permitted class? . . It is the contention of the defendants in error that the amendment of March 4, 1925, was to relieve the Veterans' Bureau of the duty of electing and determining next of kin according to the laws of the soldier's domicile, and to whom the present value of the unpaid installments should be paid, and to shift that burden to the administrator appointed at the place of domicile. The administrator thus becomes the trustee or agent of the Federal government in passing the fund arising under this policy of insurance to the members of the permitted class who are the beneficiaries thereunder. Section 22 of the war-risk insurance act has especially exempted from all taxation the allotments and family allowances, compensation, and insurance payable under the war-risk insurance act. This law was 'a war measure, passed in the exercise of a power to which all other rights and powers are subservient.' In re Geier, 155 La. 167, 99 So. 26, 32 A. L. R. 353. . . The question may be stated as follows: If the payment is to the beneficiaries by the government, then under section 22 of the war-risk insurance act there can be no succession tax. If, on the other hand, the payment to the administrator of the deceased ends the connection of the government with the fund in question, then the same becomes subject to the State inheritance tax, the same as any other asset coming from whatsoever source into the hands of the administrator and would be subject to the succession tax. We can not take this view of the war-risk insurance act, and we believe that the same provides for a payment arising from a contract between the soldier and the government, which under certain circumstances inures to the benefit of the permitted class, including uncles and aunts of the deceased soldier. This right to take this property is by virtue of a contract between the United States government and the soldier, and does not arise by reason of the statutes of descent and distribution of this State, even though the government has seen fit to distribute such fund through the agency of an administrator acting under the statutes of descent and distribution of the State of Ohio. It is reasonable to assume that the purpose of Congress in making the payment to the administrator of the deceased soldier was for the benefit of the government, to relieve the government of the necessity of selecting and determining the next of kin of the deceased soldier to whom

payment should be made. . . The administrator becomes a mere trustee or conduit for the government to make the payments to the persons entitled to the same under the provisions of the Federal law. The intestate laws do not operate upon the decedent's property, but are referred to in order to determine who shall take the proceeds of the insurance. Congress had a right to adopt the course of descent prevailing in the State of the residence of the soldier, and the proceeds of the insurance therefore pass under the Federal act, the intestate laws of Ohio being adopted as a standard or guide for ascertaining the next of kin to whom payment shall be made. The provisions of section 22 of the act of June 7, 1924, providing for exemption from taxation, must dominate over the succession tax statutes of Ohio, because of the provision of paragraph 2, art. VI of the United States constitution, providing that: 'The constitution, and the laws of the United States which shall be made in pursuance thereof, . . shall be the supreme law of the land; and the judges of every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding.' As was held by Mr. Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 436, 'The court has bestowed on this subject its most deliberate consideration. The result is a conviction that the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.' " The Ohio court then proceeded to distinguish the cases in 178 U. S., cited by the minority, and said: "Entertaining the view that Congress has power to provide for payment to the next of kin of the deceased soldier in such manner as it may determine, and that such proceedings, being for the benefit of dependents, constitute a special, distinct class of property different from a general estate of a deceased soldier, such fund, by section 22 of the act, is exempt from the inheritance tax under the Ohio statute."

The Supreme Court of West Virginia, in Watkins v. Hall 107 W. Va. 202 (147 S. E. 876), in a case involving the commuted value of a war-risk insurance policy, held that it was not subject to the State inheritance tax, and construed 38 U. S. C. A., § 421

et seq. and §§ 454, 514 just as they were construed in re Geier, 155 La. 167 (supra), and by the Supreme Court of Ohio in re Ohio v. Rife, supra. In re Wanzel's Estate, 295 Pa. 419 (145 Atl. 512), the Supreme Court of Pennsylvania held that under the tax exemption provided by the Federal statute monthly installments of war-risk insurance were not subject to the State inheritance tax. Chief Justice Moschzisker, delivering the opinion of the court, said: "The question involved is whether . . the fund involved can be taxed by the State. In answering this question in the affirmative, the court below relied on our decision in Oglivie's Estate, 291 Pa. 326, 139 Atl. 826, and on two New York Surrogate's Court decisions, namely, Schaeffer's Estate, 130 Mis. Rep. 436, 224 N. Y. S. 305, and Dean's Estate, 131 Mis. Rep. 125, 225 N. Y. S. 543. As to the first of the above-named cases, it is sufficient to say that no question of taxation was there involved, and, as to the others, that we do not agree with the determination there reached. Our view agrees with the decision in Tax Commissioner of Ohio v. Rife, 119 Ohio, 83, 162 N. E. 390; and since the facts there involved closely approximate those in the present case, we shall quote liberally from the opinion in that case. . . We shall quote another excerpt from Tax Commissioner of Ohio v. Rife, as amply covering a point of argument made in the instant case, that, since United States bonds held by a decedent's estate are subject to State inheritance tax, the same reasoning should make a war-risk insurance fund, such as the one now before us, equally subject to inheritance tax. In disposing of this point the Supreme Court of Ohio said: 'Much stress is placed . . upon the cases of Plummer v. Coler, 178 U. S. 115 . . and Murdock v. Ward, 178 U. S. 139, . . in which it is held that bonds of the United States, the property of a decedent, are subject to the State inheritance tax. Of course such obligations, reciting the ordinary relation of debtor and creditor between the government and the holder thereof, are like any other property of a decedent, and pass as any other asset of his estate, and are therefore rightly subject to State inheritance tax. However, the proceeds of war-risk insurance are a definite kind of property, differing from the ordinary property of a soldier's estate, and are in the nature of a beneficence or gratuity, pension or bounty, . . a part of [the Federal government's] war policy. . . This distinct class of property is not subject to the claims of creditors, or

taxation and is solely for the benefit of the soldier, his dependents and next of kin. Such assets pass . . by virtue of the Federal act, and the decisions in . . Plummer *v.* Coler . . and Murdock *v.* Ward . . do not relate to property of that character.'" The Pennsylvania court cited approvingly the Geier case, supra, decided by the Supreme Court of Louisiana, and concluded by saying: "The two cases above quoted from so amply cover all the points in the case before us, it would serve no useful purpose to further elaborate our reasons for the order which we are about to make." Which order reversed the judgment of the lower court which had held that the property was not exempt from taxation.

*Judgment affirmed. All the Justices concur, except Atkinson and Gilbert, JJ., who dissent.*

GILBERT, J., dissenting. The original thirteen States possessed all sovereign powers, and in forming the Federal government, the United States, they created a government of limited powers. It was endowed with only such powers as were delegated to it, expressly or by necessary implication. The United States constitution went into effect on March 4, 1789. The first ten amendments were submitted to the several States by a joint resolution of Congress, September 25, 1789, under a preamble reciting: "The conventions of a number of States having at the time of their adopting the constitution expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added. And as extending the ground of public confidence in the Government will best insure the beneficent ends of its institution." The tenth amendment, intended to make clear that the States reserved all powers not delegated, is: "The powers not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." As other States were admitted the powers of the union remained limited to those delegated by the States. One of the chief purposes for creating the new government as declared in the preamble to the constitution was "to form a more perfect union." The last and concluding words of that great document, excepting only the date and the names of the signing patriots, are "done in convention by the unanimous consent of the States present." Wherever, therefore, the power to tax is delegated to the United States, unless the grant is made exclusive, the States retained con-

current power to tax. Restrictions on the power of States to tax must be within the constitution, State or United States, or they can not possibly exist. See United States v. Boyer, 85 Fed. 430. "This government is acknowledged by all to be one of enumerated powers.. The principle that it can exercise only the powers granted to it would seem too apparent" to require argument, and "We admit, as all must admit, that the powers of the government are limited and that its limits are not to be transcended." McCulloch v. Maryland, 4 Wheat. 404, 420 (supra).

It is universally admitted that the United States constitution is supreme over all the departments of the national government, and, to the extent of the powers delegated, over all who made themselves parties to it, States as well as persons; it is supreme over the people of the United States aggregately and in their separate sovereignties. It constitutes a part of the law of each State, and is binding upon the people and authorities of the State. Dodge v. Woolsey, 18 How. 331, 347 (15 L. ed. 401); Farmers &c. National Bank v. Dearing, 91 U. S. 29, 35 (23 L. ed. 196); Shreveport v. Cole, 129 U. S. 36, 43 (9 Sup. Ct. 210, 32 L. ed. 589); Davis v. Burke, 179 U. S. 399, 403 (21 Sup. Ct. 210, 45 L. ed. 249); Cooper v. Telfair, 4 Dall. 14, 18 (1 L. ed. 721). The State has power, so long as it does not conflict with the constitutional inhibitions, to tax all persons, property, and business within its jurisdiction. Hughes v. Dundee Mortgage Co., 140 U. S. 98 (11 Sup. Ct. 727, 35 L. ed. 354); Dundee v. School Dist., 19 Fed. 359; High v. Coyne, 178 U. S. 111 (20 Sup. Ct. 747, 44 L. ed. 997); Rast v. Van Deman, 240 U. S. 342 (36 Sup. Ct. 370, 60 L. ed. 679, L. R. A. 1917A, 421); Tanner v. Little, 240 U. S. 369, 36 Sup. Ct. 379, 60 L. ed. 691); Van Allen v. Assessors, 3 Wall. 573 (18 L. ed. 229); Hamilton v. Massachusetts, 6 Wall. 632 (18 L. ed. 904); Oulton v. Savings Inst., 17 Wall. 109 (21 L. ed. 618); Barnes v. Railroads, 17 Wall. 294 (21 L. ed. 544); State Tonnage Tax Cases, 12 Wall. 204 (20 L. ed. 370); License Tax Cases, 5 Wall. 462 (18 L. ed. 497); Pervear v. Massachusetts, 5 Wall. 478 (18 L. ed. 608); Flaherty v. Hanson, 215 U. S. 515; U. S. v. Snyder, 149 U. S. 210 (13 Sup. Ct. 846, 37 L. ed. 705); Dodge v. Woolsey, supra; McGuire v. Commonwealth, 3 Wall. 387 (18 L. ed. 226; Hylton v. United States, 3 Dall. 171 (1 L. ed. 556); Scholey v. Rew, 23 Wall. 331 (23 L. ed. 99); Head Money Cases, 112 U. S. 580 (5 Sup. Ct. 247, 28 L.

ed. 798) ; Knowlton v. Moore, 178 U. S. 41 (20 Sup. Ct. 747, 44 L. ed. 969) ; Patton v. Brady 184 U. S. 608 (22 Sup. Ct. 493, 46 L. ed. 713) ; Snyder v. Bettman, 190 U. S. 249 (23 Sup. Ct. 803, 47 L. ed. 1035) ; South Carolina v. United States, 199 U. S. 437 (26 Sup. Ct. 110, 50 L. ed. 261) ; Veazie Bank v. Fenno, 8 Wall. 533 (19 L. ed. 482).

"In respect . . to property, business, and persons, within their respective limits," the power of taxation of the States "remained and remains entire. . . The extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised, are all equally within the discretion of the legislatures to which the States commit the exercise of the power. That discretion is restrained only by the will of the people expressed in the State constitutions or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the national government. There is nothing in the constitution which contemplates or authorizes any direct abridgment of this power by national legislation. To the extent just indicated it is as complete in the States as the like power, within the limits of the constitution, is complete in Congress." Lane County v. Oregon, 7 Wall. 71, 77 (19 L. ed. 101).

"The power of taxation of each of the States over all persons and property within its jurisdiction is an inherent and not a delegated power, and knows no limits except those imposed expressly or by plain implication in the constitution of the United States. The power of taxation of each of the States is specifically restricted by the provisions of the constitution of the United States relating to imposts or duties on imports and exports, and duties of tonnage, and by the constitutional inhibition of State laws impairing the obligation of contracts, or discriminating against citizens of other States. The fourteenth amendment to the constitution of the United States, in providing that no State shall deprive any person of his property without due process of law, prevents any State from taxing persons, property, privileges, or occupations not within its jurisdiction; from raising money under the guise of taxation for purposes not public; and from employing arbitrary and oppressive methods of assessing and collecting taxes. The power of taxation by the States is further restricted by the provision of the Federal constitution to the effect that no State may tax the property or

instrumentalities of the United States, impose a burden upon foreign or interstate commerce, or impose a tax in violation of a treaty of the United States." 26 Ruling Case Law, 86, § 63.

In Thomson v. Pacific R. Co., 9 Wall. 579 (19 L. ed. 579), the Supreme Court had under consideration a suit instituted by Thomson and others as stockholders of a railroad company, seeking to enjoin the railroad company and the treasurers of several counties in the State of Kansas from the payment and collection of taxes levied by the State of Kansas on property of the railroad company; and the railroad company was originally chartered by the territory of Kansas, subsequently affirmed and enlarged by the State of Kansas. Subsequently to that the railroad was incorporated by Congress with power to construct a railroad and telegraph westward through the territory of the United States, and for other purposes. The United States granted large bounties to the railroad company and in turn the company was bound to perform certain duties, such as carrying the mail, etc., and ultimately was to pay five per cent. of its net earnings to the United States. Complainants insisted the company would be greatly hindered and embarrassed in the performance of its obligations to the United States if the State of Kansas were permitted to impose and collect taxes. That is not a full statement of the case, but it is sufficient for present purposes. The Supreme Court affirmed the right of the State to levy and collect the tax, and in the opinion said in part: "No one questions that the power to tax all property, business, and persons, within their respective limits, is original in the States and has never been surrendered. It can not be so used, indeed, as to defeat or hinder the operations of the national government; but it will be safe to conclude, in general, in reference to persons and State corporations employed in government service, that when Congress has not interposed to protect their property from State taxation, such taxation is not obnoxious to that objection. We perceive no limits to the principle of exemption which the complainants seek to establish. It would remove from the reach of State taxation all the property of every agent of the government. Every corporation engaged in the transportation of mails, or of government property of any description, by land or water, or in supplying materials for the use of the government, or in performing any service of whatever kind, might claim the benefit of ex-

emption. The amount of property now held by such corporations, and having relations more or less direct to the national government and its service, is very great. And this amount is continually increasing; so that it may admit of question whether the whole income of the property which will remain liable to State taxation, if the principle contended for its admitted and applied in its fullest extent, may not ultimately be found inadequate to the support of the State governments."

The rule of construction governing reserved powers is given by the court in Livingston *v.* Van Ingen, 9 Johns. (N. Y.) 507, in the following language: "When the people create a single, entire government, they grant at once all the rights of sovereignty. The powers are indefinite and incapable of enumeration. Everything is granted that is not expressly reserved in the constitutional charter, or necessarily retained as inherent in the people. But when a Federal government is erected with only a portion of the sovereign power, the rule of construction is directly the reverse, and every power is reserved to the members that is not, either in express terms or necessary implication, taken away from them, and vested exclusively in the Federal head. This rule has not only been acknowledged by the most intelligent friends to the constitution, but is plainly declared by the instrument itself. Congress have power to lay and collect taxes, duties and excises; but as these powers are not given exclusively, the States have a concurrent jurisdiction, and retain the same absolute powers of taxation which they possessed before the adoption of the constitution, except the power of laying an impost, which is expressly taken away. This very exception proves that, without it, the States would have retained the power of laying an impost; and it further implies that in cases not excepted the authority of the States remains unimpaired."

In Bank of Commerce *v.* Tennessee, 161 U. S. 134, 146 (16 Sup. Ct. 456, 40 L. ed. 645), the Supreme Court said: "These cases show the principle upon which is founded the rule that a claim for exemption from taxation must be clearly made out. Taxes being the sole means by which sovereignties can maintain their existence, any claim on the part of any one to be exempt from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language.

There must be no doubt or ambiguity in the language used upon which the claim to the exemption is founded. It has been said that a well founded doubt is fatal to the claim; no implication will be indulged in for the purpose of construing the language used as giving the claim for exemption, where such claim is not founded upon the plain and clearly expressed intention of the taxing power." With reference to the relinquishment of its taxing power by a State, it was said, in Providence Bank v. Billings, 29 U. S. 514 (7 L. ed. 939) : "It would seem that the relinquishment of such a power is never to be presumed. We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear." See also 2 Cooley on Taxation (4th ed.), § 672.

I shall now look to the constitution of the United States, the only authoritative source, to ascertain what powers have been delegated by the States to the United States to impose restrictions upon said taxation. There is a clear limitation of such power, found in art. 1, §§ 9, 10 (Civil Code (1910), §§ 6649, 6653) : "No State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws. . . No State shall, without the consent of Congress, lay any duty of tonnage," etc. In art. 1, § 8 (Civil Code (1910), § 6644), it is expressly declared that "The Congress shall have power—1. To lay and collect taxes, duties, imposts, and excises; to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States." This is an express power to tax, and contains no prohibition of State taxation. The States, therefore, as to this grant, retained concurrent power. The preamble to the United States constitution recites, as a purpose for forming the Union to "provide for the common defense," and art. 1, sec. 8 (Civil Code (1910), § 6644), grants power to "declare war," "to raise and support armies," "to provide and maintain a navy." It is obvious that none of these contains any restriction on the taxing powers of the

State, either express or implied. With reference thereto Mr. Justice Story says, in his work on the constitution, §§ 907, 908: "Do the words, 'to lay and collect taxes, duties, imposts, and excises,' constitute a distinct, substantial power; and the words, 'to pay the debts and provide for the common defense and general welfare of the United States,' constitute another distinct and substantial power? Or are the latter words connected with the former, so as to constitute a qualification upon them? This has been a topic of political controversy, and has furnished abundant materials for popular declamation and alarm. If the former be the true interpretation, then it is obvious that, under color of the generality of the words, 'and provide for the common defense and general welfare,' the government of the United States is in reality a government of general and unlimited powers, notwithstanding the subsequent enumeration of specific powers. If the latter be the true construction, then the power of taxation only is given by the clause, and it is limited to objects of a national character, 'to pay the debts and provide for the common defense and the general welfare.'" Then the learned Justice proceeds to state in his own words how the constitutional provision would stand as construed by him, as follows: "'The Congress shall have power to lay and collect taxes, duties, imposts, and excises, in order to pay the debts, and to provide for the common defense and general welfare of the United States;' that is, for the purpose of paying the public debts, and providing for the common defense and general welfare of the United States. In this sense Congress has not an unlimited power of taxation; but it is limited to specific objects,—the payment of the public debts, and providing for the common defense and general welfare. A tax, therefore, laid by Congress for neither of these objects would be unconstitutional, as an excess of its legislative authority."

The late Mr. Justice Miller, of the Supreme Court of the United States, at his death, left a carefully prepared manuscript of lectures upon the constitution of the United States, which were both scholarly and instructive. Among them was a lecture delivered on that clause of the Federal constitution, art. 1, § 8, with reference to the power delegated to Congress to lay and collect taxes to pay the debts and provide for the common defense and general welfare of the United States, quoted above. In that lecture he said: "It

may be noted that the language is 'to lay and collect taxes, duties, imposts, and excises,' and then there comes a comma, after which it continues, 'to pay the debts and provide for the common defense and general welfare of the United States.' . . This clause in regard to paying the debts and providing for the common defense and general welfare constitutes a proper qualification of the ·power to collect taxes, . . so that it seems probable that the meaning is that Congress shall have power to lay these taxes and collect them in order 'to pay the debts and provide for the common defense and general welfare.' " Miller on the Constitution of the United States, 230. "Power to tax for State purposes is as much an exclusive power in the States as the power to lay and collect taxes to pay the debts and provide for the common defense and general welfare is an exclusive power in Congress." Ward *v.* Maryland, 12 Wall. 418, 427 (20 L. ed. 449). With reference to the preamble to the Federal constitution Mr. Justice Story said, in his work on the Constitution, "And here we must guard ourselves against an error which is too often allowed to creep into the discussions upon this subject. The preamble never can be resorted to, to enlarge the powers confided to the general government, or any of its departments. It can not confer any power per se. It never can amount, by implication, to an enlargement of any power expressly given. It can never be the legitimate source of any implied power, when otherwise withdrawn from the constitution. Its true office is to expound the nature and extent and application of the powers actually conferred by the constitution, and not substantively to create them. For example the preamble declares one object to be 'to provide for the common defense.' No one can doubt that this does not enlarge the powers of Congress to pass any measures which they may deem useful for the common defense." The common defense to which the preamble in the constitution refers is explicitly stated in art. 1, sec. 8, U. S. Constitution (Civil Code (1910), § 6644). Exclusive jurisdiction was delegated to the Federal government over interstate commerce. The Supreme Court has construed that section, art. 1, § 8, clause 3, to delegate to the Federal government a restriction upon State governments to the extent that no State shall lay, even under the guise of taxation, a burden upon interstate commerce. *Postal Telegraph-Cable Co.* v. *Cordele,* 139 *Ga.* 126 (76 S. E. 744, Ann. Cas. 1914A, 984) ; *Crump* v. *McCord,* 154 *Ga.* 147 (113 S. E. 534).

Chief Justice Marshall, in McCulloch *v.* Maryland, 4 Wheat. 405 (supra), said "Should Congress, in the execution of its powers, adopt measures which are prohibited by the constitution, or should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government, it would· become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land." So, even if Congress enacted a statute to prohibit this State taxation, it would be declared "not the law of the land," unless authorized by the constitution. Among the implied powers delegated to the Federal government, as construed by the Supreme Court, is that State governments may not tax agencies or instrumentalities of the United States government. In McCulloch *v.* Maryland, supra, the Supreme Court was considering, among other things, whether the legislature of Maryland could pass a law taxing a branch national bank located within the State, without violating the Federal constitution. The court held in substance that the States had no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into effect the powers vested in the national government." But the court also held explicitly that the States were not deprived of resources which they originally possessed, and that they could lay a tax upon the real property of the bank in common with all other real property within the State. It also held that the State could impose a tax on the interest which the citizens of Maryland might hold in the bank, in common with other property of the same description throughout the State; and finally that a State has no power to tax an agency of the general government, for "the power to tax involves the power to destroy." Numerous authorities might readily be cited, but it is known to° all courts from the rendition of that decision at that early date that its soundness has never been questioned. On the other hand it has been uniformly followed and reaffirmed.

In *Rucker* v. *Merck,* 172 *Ga.* 793 (supra), this court dealt with the same question as that in the present case. The Justices were not unanimous, and neither the majority nor the minority seem to have dealt with the question exhaustively. No authorities were cited, and the rulings were made in what would seem to be very general terms. It was said; "Under that war-making power con-

ferred by the Federal constitution, Congress is empowered to adopt any means which it may deem necessary to contribute to the success of the undertaking." This is true, with the proviso that Congress does not resort to the exercise of any power not delegated to it by the States and contained in the Federal constitution. For the purpose of waging successful war it may resort to all species of taxation authorized by the constitution, and it may do anything else so authorized; but it is quite another thing to say that in order to successfully wage war it may prohibit the State from exercising its power of taxation, with which it has never parted. Certainly it has never expressly parted with the power of taxing such property within its jurisdiction. Can it be said to have parted with it by implication? No court and no statesman, so far as I am aware, has maintained the affirmative of that proposition. In *Rucker* v. *Merck* that specific assertion was not made. How can it be said that it is necessarily implied, in order that the United States Government may successfully carry out war, that it has the power to prohibit a State from taxing such property. The very magnitude and far-reaching effects of such a conception, it would seem, is sufficient to disprove that the States ever intended such delegation of power. It is so far-reaching that it can not in reason be implied. This country has engaged in many wars, and in the course of time may engage in others. It has fought the revolutionary war, the second war with England in 1812, the Indian wars, the war with Mexico, the war between the States, the Spanish-American war, and finally the world war. After the conclusion of each of these wars the government has responded generously in appreciation of the services of its soldiers; but if in an effort to exercise such generosity the Congress, under the spur of eager and in most cases needy ex-soldiers, could and should undertake to apply the provisions of this act to all soldiers, past and future, the effect would be calamitous. If the property sought to be taxed in this case is declared constitutionally exempt, what is to prevent other species of property, similarly purchased, from being likewise declared exempt from State taxes. I have shown that power to declare war is connected in the constitution with the power to lay taxes for that purpose, and no power to prohibit taxation by the State is contained therein. I have quoted the interpretation of Mr. Justice Story, which seems unanswerable, that no such power is given in the preamble of the constitution.

There can be found nowhere within the limits of the Federal constitution any delegation of power to the United States government, either express or implied, which will authorize the Federal government to prohibit a tax, such as the tax sought to be imposed in this case. It must necessarily follow, from what has been shown above, that no power has ever been delegated to the United States government which would authorize it to deprive the States of the power of taxing money already paid as a bounty or otherwise to a former soldier or any one else, whether such fund be in the hands of the recipient or where the latter has invested it in other property. The State has unlimited power to tax such fund or the property into which it has been invested, without let or hindrance from the Federal government. It does not matter who owns the property. While entertaining no doubt as to the soundness of what has just been said, I am justified in saying that the Congress of the United States (in 38 U. S. C. A. 217, § 545; U. S. Com. Stat. 1925, § 9127 1/2-22) has not undertaken to deprive the States of the power of taxing property such as that sought to be taxed in this instance. It will be noted that the United States statute under consideration contains the following language: "Compensation, insurance, and maintenance and support allowance *payable* [emphasis ours] . . shall not be assignable; . . shall be exempt from all taxation." Using words in their ordinary every-day sense, we are driven to the conclusion that the proper construction of the statute is that the exemption from taxation applies to such compensation only as has not been paid. That provision can not be changed by arbitrary construction to mean that after the fund is paid to the recipient, and after he has invested it in property, the fund in his hands or the property in which he has invested it can not be taxed by the State government or a municipality created by the State. In Webster's Dictionary the word "payable" is defined: "1. That may, can, or should be paid; justly due;" 2 (Law) a. That may be discharged or settled by delivery of value. b. matured; now due." The fact that the statute also provides that compensation shall not be assignable shows that the Congress intended to deal only with the right of that claimant while the fund was due and before payment. It surely did not mean to prohibit the assignment after the money had been paid. If so, the recipient could not use or invest it.

The Congress has undertaken to exempt from taxation the compensation while it is "payable." That and similar language has been frequently construed by the courts, among them, the case of State ex rel. Smith v. Board of Tax Commissioners, 132 Kan. 233 (294 Pac. 915). Attention is particularly called to the able and convincing opinion in that case. Among the cases therein cited is Cranz v. White, 27 Kan. 319 (41 Am. R. 408), in which the opinion was written by Mr. Justice Brewer, afterwards a Justice of the United States Supreme Court. In McIntosh v. Aubrey, 185 U. S. 122 (22 Sup. Ct. 561, 46 L. ed. 834) the Supreme Court said: "The plaintiff in error claims that the property having been purchased with pension money it was exempt from seizure and sale on execution under § 4747 of the Revised Statutes of the United States. . . The language of the section of itself seems to present no difficulty; and if doubt arises at all it is only on account of the decisions of courts whose opinions are always entitled to respect. Crow v. Brown, 81 Iowa, 344 (46 N. W. 993, 11 L. R. A. 110, 25 Am. St. R. 501) ; Yates County Nat. Bank v. Carpenter, 119 N. Y. 550 (23 N. E. 1108, 7 L. R. A. 557, 16 Am. St. R. 855). But, notwithstanding, we think the purpose of Congress is clearly expressed. It is not that pension money shall be exempt from attachment in all of its situations and transmutations. It is only to be exempt in one situation, to wit, when 'due or to become due.' From that situation the pension money of plaintiff in error had departed. The simplicity and directness of the statute are impaired by attempts to explain it by the use of other terms than its own. That money received is not money due, and that real estate is not money at all, would seem, if real distinctions be regarded, as obvious enough, without explanation. Nor are legal fictions applicable. Undoubtedly the law often regards money as land and land as money, and, through all the forms in which property may be put, will, if possible, trace and establish the original ownership. But these are special instances depending on special principles, and can not be made a test of the purpose of Congress in enacting § 4747. We concur, therefore, with the learned judge of the court of common pleas of Pennsylvania, that 'the exemption provided by the act protects the fund only while in the course of transmission to the pensioner. When the money has been paid to him it has "inured wholly to his benefit," and is liable to seizure as opportunity pre-

sents itself.' Pages 124, 125 of 185 U. S., 22 S. Ct. 561, 562." To the same effect see State v. Fairton Savings Fund & Building Association, 44 N. J. L. 376; Faurote v. Carr, 108 Ind. 123 (9 N. E. 350); State v. Wright (Ala.), 140 So. 584; Martin v. Guilford County, 201 N. C. 63 (158 S. E. 847); Lambert v. Guilford County, 201 N. C. 67 (158 S. E. 849); the last two cases dealing directly with the same question with which we are dealing in connection with the world war veterans' act, and both holding that property purchased by a world war veteran with money paid him by the government under the act mentioned is not exempt from State taxation.

The court should have sustained the demurrers and dismissed the petition. It was also error to admit the evidence referred to in the third headnote. Mr. Justice Atkinson concurs in this dissent.

Since the decision of the above case, my attention has been directed to the case of State ex rel. Smith v. Board of Commissioners of Shawnee County, 132 Kan. 233 (294 Pac. 915), and to the fact that the Supreme Court of the United States denied certiorari. 283 U. S. 855. That is tantamount to an approval by the Supreme Court of the judgment of the Supreme Court of Kansas, which is in line with Martin v. Guilford County, cited in the foregoing dissenting opinion.