The People of the State of Illinois ex rel. Oscar Nelson, Auditor of Public Accounts, Complainant Below, v. Stony Island State Savings Bank, Defendant Below.

In re Intervening Petition of Edwin C. Kuhn, Appellee, v. Irwin T. Gilruth, Receiver of Stony Island State Savings Bank, Appellant.

Gen. No. 36,454.

Opinion filed November 21, 1933.

KIRKLAND, FLEMING, GREEN & MARTIN, for appellant; ADRIAN L. HOOVER, DUDLEY F. JESSOPP and EUGENE SWIGART, of counsel.

HARRY A. SEWELL and BRAMHALL & NOVOTNY, for appellee.

MR. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court.

This appeal by Irwin T. Gilruth, receiver for the Stony Island State Savings Bank, seeks to reverse an order entered by the superior court upon the intervening petition of Edwin C. Kuhn, finding petitioner's claim against the bank to be preferred and directing the receiver to pay same forthwith.

The intervening petition was filed in a proceeding instituted by the auditor of public accounts of the State of Illinois (hereinafter referred to as the state auditor) requesting the court to confirm the appointment of a receiver theretofore made by him for the purpose of liquidating the affairs of the Stony Island State Savings Bank (hereinafter referred to as the bank). No question arises on the pleadings.

The stipulated facts are that, March 24, 1931, petitioner presented to the bank a check payable to himself for $778.58, drawn on the treasury of the United States, representing a loan on his adjusted service compensation certificate, issued to him in accordance with the provisions of the World War Adjusted Compensation Act; that the bank paid to petitioner $278.58 in cash and at his request credited the balance to a savings account then and there opened by petitioner; that a savings account ledger card was signed by petitioner and a savings account pass book issued to him; that the petitioner withdrew $100 from the account April 27, 1931, and that a balance of $400 remained on deposit in the account to his credit until the bank closed June 9, 1931; that Gilruth was appointed receiver of the bank by the state auditor July 10, 1931, and his appointment was confirmed by the superior court July 22, 1931.

The receiver contends that petitioner is an ordinary general creditor of the bank to the amount of his deposit, entitled to share ratably with other general creditors in the liquidation of its assets, that no claim for priority may be allowed by reason of the fact that the source of the money deposited was a loan from the United States government upon an adjusted service compensation certificate issued pursuant to Title 38, ch. 11 of the United States Code Annotated, or by reason of any exemption under section 618 of that chapter, providing that the proceeds of such loans ''shall not be subject to attachment, levy or seizure under any legal or equitable process.''

Petitioner's theory is that he never received that portion of the proceeds of the loan on his adjusted service compensation certificate, represented by the $400 remaining on deposit in his savings account in the bank, as contemplated by Congress, which intended that the proceeds of such loans should inure wholly and solely to the benefit of the veteran and his dependents, but that the bank received and retained that amount of the proceeds of the loan and that the action of the state auditor in taking control of the bank constituted a seizure under legal or equitable process; and that the receiver actually has possession of the proceeds of petitioner's loan without lawful right thereto and is holding the same as trustee for the sole use and benefit of petitioner. Petitioner also contends that the $400 of the proceeds of the loan on deposit in the bank, not having reached him and not having been used by him or for his benefit, still remained the money of the United States government and entitled him to preference against the receivership estate under sec. 3466, U. S. Revised Statutes (3 USCA, p. 191). -

Petitioner's last contention may be readily disposed of. Sec. 3466, U. S. Revised Statutes (3 USCA, p. 191) provides as follows:

"Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor in the hands of executors or administrators is insufficient to pay all of the debts due from the deceased the debts due the United States shall be first satisfied and the priority hereby established shall stand as well to cases in which a debtor not having sufficient property to pay all his debts makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed or absent debtor are attached by process of law and as to cases in which an act of bankruptcy is committed."

The authorities of various States have been in conflict as to what constituted government funds within the meaning of sec. 3466, *supra,* in order to warrant priority to them in the distribution of the assets of insolvent banks or estates. *State ex rel. Sorensen v. Security Bank of Creighton,* 121 Neb. 521, 237 N. W. 620, where money payable under a war risk insurance policy had been transmitted by check drawn on the United States treasury to the administratrix of the estate of the insured, a deceased soldier, and deposited by her in a bank that subsequently became insolvent; *State ex rel. Spillman v. First State Bank of Pawnee City,* 121 Neb. 515, 237 N. W. 623, where war risk insurance payments had been made by the United States to the guardian of an incompetent soldier and deposited by him in a bank thereafter closed for insolvency; and *People ex rel. Oscar Nelson, Auditor of Public Accounts of the State of Illinois v. John B. Colgrove & Company State Bank,* 267 Ill. App. 317, where the guardians of minor children (in one instance the children of a permanently and totally disabled veteran of the World War, and, in the other, a minor brother of a soldier who died in the service) had received payments of money from the United States under the terms of the World War Veteran's Act for the use

and benefit of their wards, and deposited same in a bank that afterward became insolvent, all held that funds deposited by the guardian of a veteran or his dependents, or the administrator of a veteran's estate, which represented proceeds of war risk insurance policies, disability payments or other governmental benefits provided for former soldiers and their dependents, and which had not reached the hands of the ultimate beneficiary or beneficiaries, remained government funds until their distribution and allowed them preference upon claims against the estates of the insolvent banks involved on the theory that the guardian or administrator was the agent of the United States government and not the agent of the veteran or his estate. These cases also held that the guardian or administrator was "a mere conduit" through which the funds were transmitted and applied for the benefit of the veteran or his estate, and that until actual transmission of the funds to the beneficiary took place or until actual application for the benefit of the veteran or his dependents was made, the moneys remained government funds.

In the instant case we have no guardian, administrator, conservator or executor receiving government funds for the benefit of a veteran or his estate, but a direct transmission to the veteran himself of a check drawn on the United States treasury and payable to the veteran which represented a loan made by the government to the petitioner on his adjusted service compensation certificate. No case has been cited, and we can find none, that holds that after the government has directly transmitted to a veteran its check for the amount of such a loan, there was a reservation on the part of the government of any interest in the money loaned that would authorize the allowance of a claim to priority on the ground of ownership of the fund by the government.

Stating as its reason for granting a writ of certiorari that the question had not theretofore been considered by it and that the decisions of the State courts were in conflict, the Supreme Court of the United States in its opinion on a writ of certiorari to the Court of Appeals of the Commonwealth of Kentucky, in a cause entitled *Letcher Spicer by Sam Spicer, Guardian and Committee, Petitioner v. J. Bryan Smith, Special Deputy Banking Commissioner and Liquidating Agent of Hargis Bank and Trust Company,* published April 1, 1933, in advance sheet, vol. 53, No. 11, p. 415, Supreme Court Reporter, held that payment of war risk insurance and disability compensation to the guardian of a veteran suffering from permanent mental incompetency, vested title in the ward and discharged the obligation of the United States, and that the deposit of funds so remitted did not belong to the United States and was not entitled to priority on that ground.

The facts as disclosed by the opinion were that the petitioner was a United States soldier in the World War who had suffered permanent mental incompetency while in the service and became entitled to receive from the United States war risk insurance and disability compensation; that September 19, 1919, the county court of Breathitt county, Kentucky, appointed a guardian for him; that the United States paid to the guardian the instalments due his veteran ward and he deposited them in the Hargis Bank and Trust Company; that it became insolvent and on February 5, 1930, its assets were taken over by the special deputy banking commissioner; that the guardian had on deposit $6,070.80 derived from payments made by the United States; that the assets of the bank were not sufficient to pay more than half the total owing to depositors; that the guardian claimed priority under

sec. 3466 of the United States Revised Statutes, *supra,* and demanded payment in full; that the deputy banking commissioner held that petitioner was only entitled to share ratably with other depositors and refused to pay the claim as one entitled to priority. After stating the facts the court held in *Spicer v. Smith, supra:*

"Petitioner relies upon the clause of sec. 3466 declaring that whenever any person indebted to the United States is insolvent the debts due to the United States shall first be satisfied. He asserts that, under Acts of Congress . . . the war risk insurance and disability compensation paid to a guardian of an incompetent veteran remains the money of the United States so long as it is subject to his control and suggests that the guardian is a mere instrumentality of the United States for the disbursement of such money for the benefit of the veteran. And he maintains that the deposit here involved is money of the United States and that the bank is indebted to it therefor.

. . .

"The guardian, appointed by the county court, was by the laws of the State given the custody and control of the personal estate of his ward and was authorized to collect and receive the money in question. Ky. Stats., sec. 2030. And unquestionably payment to the guardian vested title in the ward and operated to discharge the obligation of the United States in respect of such installments. *Taylor v. Bemiss,* 110 U. S. 42, 45; *Lamar v. Micou,* 112 U. S. 452, 472; *Maclay v. Equitable Life Assurance Society,* 152 U. S. 499, 503; *Martin v. First Nat. Bank of Bush City,* 51 F. (2d) 840, 844; *In re Estate of Stude,* 179 Ia. 785, 788; *State ex rel. v. Shawnee County Com'rs,* 132 Kan. 233, 243, certiorari denied 283 U. S. 855. Schouler, Dom. Rel., 6th ed. sec. 892.

"The provisions for exemption, nonassignability and suspension of payments plainly imply the passage of title from the United States to the veteran. . . .

"It results that the deposit in question does not belong to the United States and, as indebtedness to it is essential to priority, the guardian's claim under that section is without merit. . . ."

This decision effectually disposes of petitioner's contention under sec. 3466, and not only conclusively precludes the allowance of a preferred claim on the ground of title or interest of the United States in the fund in question, but expressly overrules the doctrine pronounced in the line of cases holding that the United States reserved such ownership, title or interest in payments transmitted to guardians, administrators or conservators of veterans, their dependents, or estates, as would entitle them to priority under this section.

There remains but one question for our determination: Was the assumption of control of the assets of the insolvent bank by the receiver designated by the state auditor, a seizure under any legal or equitable process of the proceeds of a loan on an adjusted service certificate, within the comprehension of sec. 618, ch. 11, Title 38, U. S. Code Annotated, which provides as follows:

"No sum payable under this chapter to a veteran or his dependents, or to his estate, or to any beneficiary named under Part 5 of this chapter, no adjusted service certificate, and no proceeds of any loan made on such certificate, shall be subject to attachment, levy, or seizure under any legal or equitable process, or to National or State taxation."

The receiver insists that this section of the United States statutes contains no justification for a claim to priority, based on the deposit in a bank since become insolvent, of part of the proceeds of the veteran's loan on his adjusted compensation certificate, and that such

deposit simply creates the relation of debtor and creditor. Since the adoption of the Constitution of the United States our government has made provision through pensions and the payment of other benefits for those who rendered civil or military service to their country and has zealously guarded the disposition of such payments. In the beginning laws were enacted to protect such funds until they reached the hands of the beneficiary and in course of time, even after they had reached their destination, a mantle of protection was thrown around them against the encroachment of creditors, whether such funds continued in the beneficiary's possession in their original form or were in the possession of others for his use and benefit. This policy of the Congress of the United States is aptly stated in 21 R. C. L. 247, sec. 13:

"Throughout the whole period since the constitution was adopted it has been the policy of Congress to enact such regulations as will secure to the beneficiaries of the pensions granted the exclusive use and benefit of the money appropriated and paid for that purpose. With that view, sales, pledges, mortgages, assignments and every other kind of conveyance have been prohibited. . . . This power of Congress to enact such protective measures cannot well be questioned, for if it may grant pensions it is difficult to see why it may not pass laws to protect the fund appropriated for such a beneficiary of the government, certainly until it reached his hands. And power to protect the fund from misappropriation, fraud and unauthorized conversion to the use of another, and to secure its safe and unimpaired transmission to the beneficiary, has been claimed and exercised through the whole period since Congress, under the constitution, commenced to grant pensions."

An exhaustive analysis of the cases cited and all other cases appertaining to the question that we have

been able to discover after diligent search, and an examination of all sections of statutes of similar import to sec. 618, *supra,* confirms our opinion that the protection sought to be afforded is against creditors of beneficiaries of United States funds, whether in the form of pensions, loans on adjusted service certificates, disability payments or payments under war risk insurance policies, and against those who would through misappropriation, fraud, or unauthorized conversion, seek to deprive the war veteran or his dependents of payments made under any of those governmental benefits.

There are some authorities to the contrary which we will discuss later, but we feel impelled to hold that in taking possession of the assets of this insolvent bank the state auditor's receiver did not make such seizure as was contemplated under the statute; that he did not seize petitioner's property; that the $400 on deposit in the bank ceased to be petitioner's property from the moment of its deposit; that thereafter it was the property of the bank with the resultant relationship between the bank and the petitioner of debtor and creditor, the bank being the debtor, and the petitioner the creditor, and that the deposit was not in any sense seized to satisfy the demand of any creditor of petitioner.

The check drawn upon the United States treasury for the amount of this loan was delivered directly to petitioner. It was within his power to secure the entire proceeds of same at the time he presented it to the bank. The disposition of such proceeds was entirely within his control. It surely cannot be contended with any weight of authority that, if he had made improvident investments in stocks, bonds, real or personal property, upon the decline in their value for any reason, he could have legally or equitably insisted on the return of his money because it happened to represent proceeds of a loan on an adjusted service

certificate. It is idle to contend that the proceeds of petitioner's loan to the extent of $400, which remained on deposit with the bank, never reached the veteran's hands, and that that should be a determining factor in considering his claim to priority. In answer it is sufficient to state that upon presentation of his loan check to the bank the proceeds of the check were completely within his power and control. The situation is no different than it would have been if, instead of taking part of the proceeds of the check in cash and leaving the balance on deposit in a savings account in the bank, he had received the full amount represented by the check and at the same time or at some subsequent time delivered part of it back to the bank for deposit. We fail to see, so far as this transaction is concerned, that petitioner is in any different position than if he had deposited funds which he had earned in the course of his regular employment or which had come to him from any other source rather than funds which were the proceeds of a loan on his adjusted service certificate. By his deposit he launched his money on the stream of trade and finance, and if the tide of depression carried it and other deposits with which it was commingled into a sea of impaired securities, unpaid loans and shrunken values, he is precluded from claiming any advantage out of the wreck over the other stranded depositors. In place of his money he had the obligation of the bank to pay him the amount deposited with interest. When the state auditor's receiver assumed control and took possession of the assets of the bank its action was directed at the bank because of its insolvency and not because of the debt owed by the bank to the petitioner. The receiver did not act in behalf of any creditor of petitioner but his action was in pursuance of the provisions of the Illinois Banking Act for the protection of petitioner, as well as all other creditors of the bank.

In our opinion the purpose of the Congress of the United States during the entire progress and history of its beneficent legislation on pensions, bonuses, war risk insurance, disability payments and loans on adjusted compensation certificates was clearly to see to it that payments made by the United States actually reached the hands of the beneficiaries and received full protection from the claims of creditors. In the case of *Andrew v. Colo Sav. Bank,* 205 Iowa 872, 219 N. W. 62, 63, 64, where a civil war pensioner made a time deposit of pension money, known to be such at the time of its acceptance by the bank, which subsequently became insolvent and whose affairs and assets were taken under control by the state superintendent of banking, the Supreme Court of Iowa in construing exemption statutes similar to the one involved here said:

"Manifestly, the intention of the state and the federal government was to so surround the pensioner with protection that his creditors would not be able to seize the subject-matter of the bounty and thus deprive him of its use. In other words, during the course of human events, the thought became developed among states and nations that for the good of mankind there are instances when it is best that creditors go unpaid in order that certain individuals in society may have a particular source of income dedicated to personal or family sustenance, maintenance, and enjoyment. Primarily, the aim is to defend against the onslaught of creditors. Whose creditors? Clearly those of the debtor who has a right to assert the exemption, and none other.

"Throughout the years of its application, this law has been confined to attempts of 'creditors' to collect indebtednesses due them from the 'pensioner,' through the process of attachment, garnishment, execution, or some other system of levy and sequestration. For examples of this interpretation we find among many

others, the cases of *McIntosh v. Aubrey,* 185 U. S. 122, 22 S. Ct. 561, 46 L. Ed. 834; *Crow v. Brown,* 81 Iowa 344, 46 N. W. 993, 11 L. R. A. 110, 25 Am. St. Rep. 501; . . . Consequently it is consistent with and within the purview of the legislative idea, as well as in harmony with the numerous judicial pronouncements, to hold that the exemption in this instance is limited in its scope to security against the encroachments of appellee's personal 'creditors' only. Before he can have a 'creditor,' he must owe a debt. Was his property taken in the case at bar to satisfy a financial obligation which he owed to any one? Therein lies the criterion for a decision here. An answer to the preceding interrogatory will determine this litigation.

"As a result of the 'deposit,' if it were general, there was created between appellee and the bank the relationship of debtor and creditor. . . . Who then was the debtor and who the creditor? Obviously, the bank, in such event, owed appellee. Forsooth, the latter 'owed' no one through this transaction. So when, during the administration of the insolvent institution's affairs, the receiver, by appropriating the assets, was thereby using the bank's property for the payment of its liabilities rather than appellee's money for the payment of his obligations. Said exemption statutes, therefore, become immaterial under this status of appellee's affairs. He 'owed' no debts and had no creditor; therefore the prerequisite for the operation of the exemption did not exist. Need for this shield does not appear, because no antagonistic creditor was approaching."

In reversing the Court of Appeals of Georgia in a case where a Confederate veteran pensioner deposited pension money known to be such at the time it was accepted by the bank, which subsequently became insolvent, the Supreme Court of Georgia in interpreting a similar pension exemption statute of that state

in *Mobley v. Jackson,* 171 Ga. 434, 156 S. E. 23, 24, 25, in a well reasoned opinion, containing an able and exhaustive examination of the legal aspects of the problem, held:

"Our Confederate pension law does not in any way define or restrict the uses which the pensioner can make of his pension money. He can do as he pleases with it. He can save it or spend it. He can invest it or keep it in specie. He can even give it away. He can make a general deposit of it in a bank, subject to his check, or he can make a special deposit of it. He can deposit it and take therefor a time certificate, bearing interest. If he makes a general deposit of his pension money subject to check, or if he deposits it and takes therefor an interest-bearing time certificate, the title to the money so deposited immediately passes to the bank, and the relation of debtor and creditor is at once created between the parties. (Citing cases.) . . . We further agree with the Court of Appeals that section 1495 of the Penal Code 1910 is to be given a liberal construction in favor of the pensioner. Giving to this provision such liberal construction, the pensions of Confederate soldiers and their widows are exempt from garnishment and all other legal process, no matter in whose hands the pension or pensions may be, and no matter whether the pension is in the form in which it was received, or whether it had been changed into some other form. So if this pension money had been deposited in the bank, subject to check, and the pensioner had received therefor only a deposit slip, such fund would be exempt from administration by a receiver of his property. *Burgett v. Fancher,* 35 Hun (N. Y.) 647. So such a fund would be exempt from seizure by a receiver of the depositor's property, although the bank was to pay interest on the deposit. *Stockwell v. National Bank,* 36 Hun (N. Y.) 583. So where such fund is deposited in a bank by the pen-

sioner, and a certificate of deposit, bearing interest, is given therefor by the bank to the pensioner, the money payable by such obligation of the bank to the pensioner could not be subjected to garnishment or to any other process against the pensioner. So, if the pension money of a Confederate soldier is converted into property of any kind, such property under this statute cannot be subjected to any process against the pensioner. So the deposit of a pension check in a savings bank is exempt. *Price v. Savings Society,* 64 Conn. 362, 30 A. 139, 42 Am. St. Rep. 198. So, if a pensioner should invest his pension money in personal property, the latter would not be liable to be levied upon by any process in favor of his creditor or creditors. The same would be true if his pension funds had been invested in a home. The home would stand in place of the pension, and would be exempt under our statute. *Yates County National Bank v. Carpenter,* 119 N. Y. 550, 23 N. E. 1108, 7 L. R. A. 557, 16 Am. St. Rep. 855; 25 C. J. 78, sec. 130(c). So, if the pensioner had loaned out his pension money and taken a note therefor, the debtor could not be garnished at the instance of a creditor of the pensioner. So pension money received either in check 'or in specie is exempt. A pensioner may use his pension money in any manner he may desire for his own benefit, or that of his family, free from the attacks of creditors. *Holmes v. Tallada,* 125 Pa. 133, 17 A. 238, 3 L. R. A. 219, 11 Am. St. Rep. 880. So in this case the funds due upon the obligation of the bank, represented by its time certificate given to the pensioner for his pension money deposited therein cannot be subjected by garnishment or other process against the pensioner.

"... Our exemption statute exempts the pensioner 'from garnishment and all other legal process, no matter in whose hands the pension or pensions may be.' The garnishment here referred to is one issued

upon a suit against the pensioner and against some person having in his hands the pension money of the pensioner. This is likewise true of 'all other legal process.' The language that 'no court or ministerial officer in this State shall ever have jurisdiction or authority to issue or enforce any garnishment or other process against the same,' means against the pension of the pensioner, no matter in whose hands the same may be. Manifestly the intention of the legislature, in passing this statute, was to surround the pensioner with protection against his creditors, and to prevent his creditors seizing the subject-matter of the pension and thus deprive him of its use. The purpose of the statute was to defend the pensioner against the onslaught of his creditors. *Andrew v. Colo Sav. Bank,* 205 Iowa 872, 219 N. W. 62.

"While it is true that where a bank receives a deposit with knowledge that it is pension money, the resulting obligation of the bank to the pensioner is substituted for the pension, it does not follow that, where the superintendent of banks subsequently takes possession of a bank because of its insolvency, it is his duty on demand of the pensioner to restore to him the equivalent of his deposit as a fund not subject to administration. What the pensioner got in place of his pension money is the obligation of the bank, represented by its certificate, to pay him the amount of money represented therein. The pensioner got the time certificate in place of the pension money. This money when deposited in the bank became the property of the bank. The fund deposited was no longer impressed with the character of the pension. The obligation of the bank stood in place of the pension. The conversion of the pension money into a time certificate of the bank, bearing interest, was not a wrongful conversion of the pension funds. The pensioner could make such investment in order to earn money on his

saved pension money. It does not logically follow that because of such investment the pensioner would be entitled to payment from the general funds of the bank over the preferred claims specified in section 19 of the act of August 26, 1925 (Ga. Laws 1925, pp. 119, 129). The deposit of the money and the taking from the bank of the time certificate therefor, bearing interest, put the obligation of the bank represented by such certificate in the place of the pension money, and the money due on such obligation could not be subjected to any garnishment or other legal process against the pensioner; but such transaction would not have the effect of making the payee in the time certificate a preferred creditor entitled to payment out of the funds of the bank in preference to those creditors given priority by the act of 1925. This would amount to giving to the pensioner a preference not given by the Banking Act. The purpose of this exempting statute was not to give to the pensioner any lien or priority of payment for money deposited in a bank, but to protect him against garnishment or other legal process sued out by his creditor to enforce a debt due by him to such creditor.''

With the exception of *Ramisch v. Fulton,* 41 Ohio App. 443, 180 N. E. 735, and *State ex rel. Sorensen v. Security Bank of Creighton, supra,* the cases cited by petitioner in support of his contention are readily distinguishable from the case at bar.

The claim to priority in *Ramisch v. Fulton, supra,* was based on the deposit of the proceeds of a loan on an adjusted service certificate, was made under the same exemption section of the United States statutes, and the facts were parallel to the facts in this cause. The Ohio Court of Appeals reversed the trial court and allowed the veteran a preferred claim on the ground that the assumption of control of the affairs and assets of the insolvent bank was such a seizure,

under legal or equitable process of the proceeds of the veteran's loan on his adjusted service compensation certificate, as was contemplated under sec. 618, *supra*. We are unable to agree with either the reasoning or conclusions of this decision which were essentially the same as the reasoning and conclusions reached by the Court of Appeals of Georgia in its opinion in the case of *Mobley v. Jackson,* 40 Ga. App. 761, 151 S. E. 522, which was reversed by the Supreme Court of Georgia as heretofore indicated.

The petitioner cites the following paragraph from *State ex rel. Sorensen v. Security Bank of Creighton, supra*:

"This insurance was never provided for the benefit of creditors. It was specifically provided that creditors should not benefit from it. It was certainly not intended that the creditors of a third party, in this case the depositors in the Security Bank, should benefit from the fund."

We find after a careful examination of this decision that the above excerpt from it was mere dictum and that the case was decided on an entirely different theory. It has heretofore been pointed out that the pronouncement of this decision was expressly overruled by the United States Supreme Court in the *Spicer* case, *supra*.

We are constrained to agree with the receiver's contention that there is no warrant in law for petitioner's claim to priority based on his deposit in the insolvent bank, and that the exemption statute relied on did not comprehend, nor do the authorities support, any right of a beneficiary of the United States except to unimpaired delivery of the fund into his hands, and its protection, before and after delivery, in whatever form it may be found, from his personal creditors.

For the reasons stated herein the order of the superior court, allowing preference and priority to peti-

tioner's claim, is reversed and remanded with directions to the chancellor to vacate the order, and to enter an order allowing petitioner a general claim upon presentation of a proper petition.

*Reversed and remanded with directions.*

GRIDLEY and SCANLAN, JJ., concur.